**Donald F. GOLDBERG, Appellant,**

v.

**U.S. DEPARTMENT OF STATE.**

No. 86–5397.

United States Court of Appeals, District of Columbia Circuit.

Argued April 6, 1987.
Decided May 8, 1987.

Raymond D. Battocchi, for appellant. Walter H. Fleischer, Washington, D.C., also entered an appearance for appellant.

Michael L. Martinez, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Before WALD, Chief Judge, MIKVA and BORK, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Appellant Donald F. Goldberg, a journalist on the staff of Jack Anderson, seeks release of information contained in the responses of United States ambassadors around the world to a Department of State questionnaire on foreign government practices with respect to our missions abroad. The government withheld parts of those responses from him, asserting that some of the information contained therein was properly classified as "confidential" and thus exempt from the disclosure requirements of the Freedom of Information Act (FOIA).[1] The District Court agreed and granted summary judgment for the government, giving little credit to appellant's efforts to create a material, trialworthy dispute out of the fact that the majority of the ambassadors responding to the State Department's unclassified questionnaire marked their response cables unclassified as well. Appellant contends that this fact alone, unrefuted and unexplained by the government, is sufficient to raise a material issue of fact to defeat summary judgment.

Mindful of the judiciary's responsibility under FOIA to review de novo challenged classification decisions, and of the acknowledged difficulties petitioners face in overcoming a government classification decision without having access themselves to the documents in question, we nonetheless do not find in the facts of this case reason to proceed to trial. We conclude that petitioner's evidence as to the ambassadors' unclassified responses is inadequate to controvert the detailed and particularized affidavit submitted by the State Department on the reasons for classifying the withheld responses. Accordingly, we affirm the District Court's grant of summary judgment.

I. BACKGROUND

On October 13, 1982, the United States Department of State sent out by cable an unclassified questionnaire to all United States embassies and diplomatic posts around the world, requesting information concerning host government diplomatic practices and reciprocity. Joint Appendix (J.A.) 107–10. The questionnaire covered a broad range of issues, from the availability of medical facilities, to embassy security, to the accessibility of host country officials. The purpose of the questionnaire was to establish a data base on reciprocity issues and to help the State Department prioritize matters of concern for discussion and negotiation.

1. 5 U.S.C. § 552. FOIA Exemption 1 makes the statute's disclosure requirements inapplicable to certain matters required to be kept secret "in the interest of national defense or foreign poli-cy." 5 U.S.C. § 552(b)(1). The information was classified pursuant to Executive Order 12356, 47 Fed.Reg. 14874 (1982).

Appellant Goldberg filed a FOIA request with the State Department on June 5, 1984 seeking copies of the ambassadors' responses to the 1982 questionnaire. He requested the information as a journalist acting in the public interest. J.A. 102. After certain administrative delays, on March 26, 1985 the State Department informed Goldberg that it had located 161 documents in response to his FOIA request, but that only four could be fully released. Of the remaining 157 documents, nine were not to be released at all, and 148 were to be released with certain portions omitted. The State Department asserted that FOIA

**2.** The State Department also claimed that FOIA Exemption 2 applied to two document portions, and that FOIA Exemption 5 applied to three withheld excerpts. Exemption 2 frees "matters related solely to the internal personnel rules and practices of the agency," from the scope of FOIA's disclosure requirements. 5 U.S.C. § 552(b)(2). Exemption 5 pertains to inter- or intra-agency communications "which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The District Court granted summary judgment *sua sponte* for Goldberg on the Exemption 2 information and the State Department has complied with the disclosure order. J.A. 212–16. The District Court also granted summary judgment for the government with respect to the Exemption 5 documents; Goldberg has not appealed that aspect of the trial court's decision.

**3.** The affidavit, presented in the form required by *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir. 1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), was prepared by John Eaves, Director of the Office of Mandatory Review in the Classification and Declassification Center of the State Department. Eaves is authorized to classify Top Secret material and to downgrade and declassify national security information pursuant to Executive Order 12356, 47 Fed.Reg. 14874 (1982), and Department of State regulations, 22 C.F.R. § 9.14.

The Eaves affidavit explains classification decisions based on sections 1.3(a)(2), (a)(3), and (a)(5) of Executive Order 12356. *See infra* Part II.A. It divides the questionnaire responses into six groups based on the kind of information withheld. Group I, involving twenty-three documents, includes excerpts dealing with security measures adopted to protect official personnel and premises of United States missions abroad. The excerpted materials consist of the answers to questions 4.G and 4.H of the questionnaire (use of two-way radios), question 7 (protection of individuals), and question 8 (protection of premises). J.A. 235–36.

Exemption 1 applied to all of the withheld information.[2]

Goldberg brought an action in the District Court seeking disclosure of the excised document portions. The State Department filed an extensive affidavit, J.A. 217–346, indexing and describing the withheld information and asserting that the excerpts were properly classified pursuant to Executive Order 12356,[3] and simultaneously moved for summary judgment. In opposition, Goldberg attempted to create a triable issue out of the initial decisions of most of the ambassadors (or their delegates) not to classify their questionnaire responses.[4] He asserted that unlike the

Group II consists of excerpts taken from thirty-five documents. In addition to including answers to questions 4.G–H, 7 and 8, these excerpts contain "candid comments" regarding relations with host governments, and comparisons of the treatment received by the United States with that afforded to the missions of third countries. J.A. 244–46.

Group III's excerpts from twenty-six documents once again deal with matters of personnel and mission security. The excerpts from Group III documents also include statements or lists indicating the relative priority that, in each ambassador's view, various reciprocity issues should be given in United States-host country relations. J.A. 257–58.

The excerpts from the forty-six documents in Group IV contain the kinds of information covered by Groups II and III. These excerpts, in addition to addressing security measures, deal with host country relations and contain lists of priorities regarding unsettled differences between the United States mission and the host country. J.A. 267–69.

Group V consists of only nine documents either fully or substantially withheld. These documents are separate followup cables dealing solely with the issue of the United States mission's priorities in its dealings with the host government on a host of matters. J.A. 282–83.

The final group of withheld excerpts is really not a group at all, but a collection of eighteen individually described documents that did not fit any of the other five groups. The affidavit briefly describes why each of these excerpts was withheld. J.A. 288–333.

**4.** Seven responses were originally marked "confidential," *see* J.A. 252 (Yemen Arab Republic), 255 (Nigeria), 277 (India), 298 (Bulgaria), 301 (German Democratic Republic), 312 (Yugoslavia), and 332 (Zambia). Thirty-five were marked "limited official use," *see, e.g.,* J.A. 248 (Paraguay, Uruguay, Hungary), 270 (Indonesia, Laos, Malaysia), 285 (Pakistan, Cameroon, Guinea, Ivory Coast). The remainder were marked "unclassified."

more common situation where unmarked materials are later classified and withheld, in this case the ambassadors explicitly marked their responses "unclassified." The Foreign Affairs Manual specifically instructs State Department officials to treat such a marking as a term of art:

*Wholly Unclassified Material*

Normally, unclassified material shall not be marked or stamped "Unclassified" unless it is essential to convey to a recipient of such material that it has been examined with a view to imposing a security classification and that it has been determined that it does not require classification.

5 United States Department of State, Foreign Affairs Manual § 933.3 (FAM), J.A. 143. Goldberg also argued that the documents marked "limited official use" should be treated as unclassified, because the Foreign Affairs manual proscribes the use of that phrase to identify national security information. 5 FAM § 912(a)(3), J.A. 133. The District Court rejected Goldberg's argument that a trial is required to determine the validity of the reclassification, where information is initially designated "unclassified" and later classified. Memorandum Opinion (Mem.Op.) at 10, J.A. 203. On appeal Goldberg asserts in essence that he has come as close to producing the "smoking gun" as a FOIA petitioner faced with an Exemption 1 claim can ever realistically hope to, and that he was entitled to a trial, including limited discovery, examination of Eaves and *in camera* inspection of a representative sample of documents.

## II. Withholding Information Under A Disclosure Statute

■ The Freedom of Information Act requires agencies to comply with "any request for records," 5 U.S.C. § 552(a)(3),

unless one of nine specific exemptions apply, 5 U.S.C. § 552(b). It is clear from the language of the statute, and the congressional persistence in amending statutory language to overturn overly restrictive judicial interpretations,[5] that FOIA compels disclosure in every case where the government does not carry its burden of convincing the court that one of the statutory exemptions apply. Exemption 1—the "national security exemption"—is relevant to this appeal.

### A. *Exemption 1*

■ Recognizing that the disclosure of some information could be contrary to important national security interests, Congress provided for an exemption from FOIA requirements for matters "specifically required by Executive order to be kept secret in the interest of foreign policy." 5 U.S.C. § 552(b)(1) (1970). Notwithstanding a de novo judicial review provision elsewhere in FOIA, *see* 5 U.S.C. § 552(a)(4)(B), the Supreme Court interpreted Exemption 1 to require courts routinely to defer to government affidavits stating that documents had been properly classified, without engaging in any direct substantive review of the withheld information. *EPA v. Mink,* 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). Congress promptly responded by amending FOIA and clarifying its intent that courts act as an independent check on challenged classification decisions. Exemption 1 now applies only to matters that are

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy *and (B) are in fact properly classified* pursuant to such Executive order.

Pub.L. 93–502, § 2(a) (emphasis added), *amending* 5 U.S.C. § 552(b)(1). As the statute and legislative history and numer-

---

In response to Goldberg's FOIA request, the State Department reviewed all the relevant materials. As a result, portions of most documents were classified. Documents previously labelled "confidential" or "limited use only" in their entirety were released in substantial part.

**5.** The legislative history of FOIA Exemption 1, and of the 1974 amendments enacted in re-

sponse to the Supreme Court's restrictive interpretation in *EPA v. Mink,* 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), are carefully reviewed and analyzed by this court in both the per curiam and concurring opinions in *Ray v. Turner,* 587 F.2d 1187 (D.C.Cir.1978) (per curiam); *Id.,* 587 F.2d at 1199 (Wright, J. concurring).

ous decisions of this court make clear, the district court is now required to conduct a de novo review of the classification decision, with the burden on the agency claiming the exemption. 5 U.S.C. § 552(a)(4)(B); *Salisbury v. United States,* 690 F.2d 966 (D.C.1982); *Ray v. Turner,* 587 F.2d 1187 (D.C.Cir.1978). In carrying out this de novo review, courts should "accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record," [6] albeit without relinquishing their independent responsibility: "While *in camera* examinations need not be automatic, in many situations it will plainly be necessary and appropriate." S.Rep. No. 1200, 93d Cong., 2d Sess. 9 (1974), U.S.Code Cong. & Admin.News 1974, pp. 6267, 6287.

▮ Exemption 1 does not itself provide the applicable substantive standard for withholding information, but rather references standards defined by Executive Order. In this case, we turn to Exective Order 12356, 47 Fed.Reg. 14874 (1982), for national security classification standards:

1.3 *Classification Standards*

(a) Information shall be considered for classification if it concerns:

. . . . .

(2) the vulnerabilities or capabilities of systems, installations, projects, or plans relating to national security;

(3) foreign government information;

... [or]

(5) foreign relations or foreign activities of the United States.

47 Fed.Reg. at 14876. We must measure the State Department's affidavit explaining its classification of the withheld information, against these standards. Moreover, we must ensure that information *not*

> be classified in order to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not re-

quire protection in the interest of national security.

Executive Order 12356, § 1.6(a).

While Executive Order 12356 forbids classifying documents to cover up information that is embarrassing, but not threatening to national security, it explicitly allows agencies to make classification and reclassification decisions in light of, and at the time of, FOIA requests.

> (c) The President or an agency head or official designated ... may reclassify information previously declassified and disclosed if it is determined in writing that (1) the information requires protection in the interest of national security; and (2) the information may reasonably be recovered. These reclassification actions shall be reported promptly to the Director of the Information Security Oversight Office.
>
> (d) Information may be classified or reclassified after an agency has received a request for it under the Freedom of Information Act, ... if such classification meets the requirements of this Order and is accomplished personally and on a document-by-document basis by the [designated agency person].

47 Fed.Reg. 14877–78. So long as the new classification is appropriate under the standards of § 1.3, reclassification is permitted.

B. *Summary Judgment Standards*

▮ The exercise of independent, responsible, de novo review of classification decisions under Exemption 1 does not necessarily require a full trial. A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is still available to either party. Indeed, this court has already set out the particular standard district courts should apply to motions for summary judgment in Exemption 1 cases:

> [A]n agency is entitled to summary judgment if its affidavits describe the withheld information and the justification for withholding with reasonable specificity,

---

**6.** *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir.1981) (quoting S.Rep. No. 1200, 93d Cong., 2d Sess. 12 (1974), U.S.Code Cong. &

Admin.News 1974, p. 6290). (emphasis added by court).

demonstrating a logical connection between the information and the claimed exemption, ... and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith. *Abbotts v. Nuclear Regulatory Commission,* 766 F.2d 604, 606 (D.C.Cir.1985) (internal quotations omitted).

 In deciding whether to grant summary judgment, district courts should give the agency the opportunity to present detailed affidavits, and accord those affidavits "substantial weight," considering the agency's "unique insights into what adverse [e]ffects might occur as a result of public disclosure." S.Rep. No. 1200, *supra,* at 12, U.S.Code Cong. & Admin.News 1974, p. 6290. The district court must insist, however, that such affidavits afford a "relatively detailed analysis [of the material witheld] in manageable segments." "[C]onclusory and generalized allegations of exemptions" are not acceptable. *Ray v. Turner,* 587 F.2d at 1191 (D.C.Cir.1978) (quoting *Vaughn v. Rosen,* 484 F.2d at 826 (D.C.Cir.1973)); *see also* S.Rep. No. 854, 93d Cong., 2d Sess. 15 (1974) (explicitly supporting *Vaughn* approach). The affidavits must furthermore demonstrate "a logical connection between the information and the claimed exemption." *Salisbury v. United States,* 690 F.2d at 970.

 The District Court applied the appropriate summary judgment standard here and concluded that the Eaves affidavit complied with the requirements set out in *Abbotts v. NRC.* The affidavit "describes both the material withheld and justifications underlying those withholdings with particularity, and it amply demonstrates the connection between the information withheld and the exemption claimed in a non-conclusory fashion." Mem.Op. at 8, J.A. 201. We find little to dispute on that score;[7] indeed, it is to the second part of the *Abbotts* test that Goldberg's arguments are directed.

In order to obtain summary judgment under the decisions of this court, the agency's affidavit must not be "controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey,* 656 F.2d at 738. Goldberg opposed the government's motion for summary judgment by alleging not that the State Department has proceeded in bad faith, but that the undisputed fact that the majority of the ambassadors responding to the questionnaire marked their answers "unclassified" constitutes "contrary evidence in the record" controverting the State Department's assertion that the withheld information was properly classified. The District Court found, however, that the explicit authority to reclassify documents at the time of a FOIA request, *see* Executive Order 12356, § 1.6, directly contradicted Goldberg's proposition.

[P]laintiff would have this Court rule that where information originally designated "unclassified" is later classified, the original classification status of the

---

7. Although the Eaves affidavit might have been more complete had it recognized and dealt with the ambassadors' different views on the proper classification of the questionnaire responses, it certainly does an adequate job of justifying the current classification of the document excerpts. The affidavit demonstrates a careful, document-by-document and answer-by-answer review. Documents that had originally been classified "confidential" in their entirety have been partially released. Documents marked "limited official use" have been brought into conformity with recognized national security classifications, by releasing some of the information contained in them as unclassified, and withholding other excerpts as "confidential." *See supra* note 4.

The Eaves affidavit identifies particular answers to questions, describes in some detail the kind of information that ambassadors provided in response, and links that information to the national security and foreign relations interests listed in Executive Order 12356. For example, information about the use of two-way radios in embassy vehicles and about the kind of security forces permitted at United States missions directly concerns "the vulnerabilities or capabilities of systems, installations," Executive Order 12356, § 1.3(a)(2). Information concerning the relationship between the United States mission and the host country, and the mission's priorities for dealing with difficulties they may be having, or with unsettled differences concerning diplomatic reciprocity matters, addresses "foreign relations or foreign activities of the United States," Executive Order 12356, § 1.3(a)(5). *See supra* note 3.

information casts such doubt on the propriety of the later classification that a trial is necessary to determine the validity of that reclassification. Such a rule would necessarily result in what plaintiff protests: a vast over-classification of innocuous information by forcing agencies to classify information initially at the highest level possible, or face trial if that information is later deemed sensitive and is sought in a FOIA action. In addition, such a rule penalizes agencies for exercising their legitimate authority under the Executive Order.

Mem.Op. at 10, J.A. 203. The District Court then granted summary judgment for the State Department on all Exemption 1 claims.

## III. IN SEARCH OF GROUNDS FOR TRIAL

■ The only question for this court is whether the information withheld under Exemption 1 has been properly classified. Whether it was once unclassified is immaterial under FOIA. Executive Order 12356, § 1.6(d) authorizes agencies to reclassify documents even while there is a FOIA request pending for that very information.

■ Goldberg's best argument, which the District Court rejected, was that the fact that some one hundred ambassadors acting independently explicitly marked the cables "unclassified," at least raises an issue of fact as to whether portions of those cables are now improperly classified "confidential."[8] Goldberg asks the court to draw an inference from the "unclassified" marking on the majority of the cabled responses, that, as the Foreign Affairs Manual prescribes, each of those ambassadors thought it "essential to convey" that

---

**8.** Goldberg has also offered a series of other reasons why summary judgment on the classification question should not have been granted: he has argued that the fact that some of the documents were at some point marked *"de* classified," *see, e.g.,* J.A. 89–94 (Tunisia), compels the inference that someone with declassification authority decided that the documents could now be released to the public, regardless of how they were previously designated, *see* 5 FAM § 921, J.A. 136. This argument does not significantly differ from Goldberg's main challenge and neither does the response: the Eaves affidavit explains why the document is properly classified now, pursuant to the reclassification authority of Executive Order 12356, § 1.6. The mere fact that a document has been recently reclassified, without more, does not controvert a detailed explanation why the document is properly classified today.

Goldberg has argued that because the Eaves affidavit claimed Exemption 2 with respect to two document excerpts, but the District Court concluded that the exemption for "internal personnel rules and practices," 5 U.S.C. § 552(b)(2), did not apply, "there is reason to believe that [Eaves'] position on Exemption 1 may be equally incorrect." Appellant's Brief at 20. The fact that the court disagreed with Eaves with respect to the Exemption 2 excerpts only demonstrates that the court properly exercised its de novo review responsibility. The same court reviewed Eaves' Exemption 1 claims and upheld them. Nothing can be inferred with respect to whether documents were properly classified, from the resolution of the dispute on the Exemption 2 claims.

Goldberg has also tried to introduce evidence into the record that diplomatic posts have a tendency to overclassify cables whenever in doubt. *See* Declaration of Donald F. Goldberg, J.A. 118–21. If indeed ambassadors generally overclassify documents, Goldberg argued, then the fact that many of them designated their questionnaire responses "unclassified" is especially significant. Goldberg's evidence, however, consists of his own statement relating the contents of a conversation he had with Mr. Steven Garfinkel, Director, Information Security Office, General Services Administration, and of an experience Goldberg had "some time ago," when a State Department employee showed him a cable marked "confidential" which contained information that "seemed identical" to information already published in a State Department human rights report. J.A. 120. The District Court, although clearly troubled by the form of Goldberg's submission—a declaration based not on personal knowledge, but on the opinions of another—accepted the declaration for purposes of ruling on the summary judgment motion, but did not find it persuasive. Mem.Op. at 4 n. 1, J.A. 197. We are similarly unmoved. Mr. Garfinkel's opinion, as related by Goldberg, is only that: the opinion of an official in another agency, about the degree of care exercised by diplomatic officials, generally. It does not in any way controvert the explanations provided in the Eaves affidavit with regard to why certain portions of these particular documents were properly classified. Moreover, the fact that the State Department decided that it was appropriate to release some previously classified information regarding human rights violations, does not suggest that it must now release the information at issue here.

the information in the cable had been "examined with a view to imposing a security classification and that it ha[d] been determined" not to require classification.[9] 5 FAM § 933.3, J.A. 143. Even accepting, as the District Court appeared to, that each ambassador had this provision of the Foreign Affairs Manual in mind when he or she marked the cable "unclassified," the court found good reason to reject Goldberg's argument for releasing the information, finding it to be in direct conflict with the reclassification provisions of Executive Order 12356.

Goldberg does not argue that the earlier (non) classification decision in any way precludes or interferes with the right of the State Department to *reclassify* the information later, but merely that it precludes *summary judgment* as to whether the latter classification was proper. Neither does he deny that had the responses been unmarked, the Eaves affidavit would have been sufficient to support summary judgment for the agency. *See* Appellant's Brief at 21–22. Essentially, Goldberg contends that this case should be treated as if the hundred or so ambassadors had each stated that the information the State Department was now trying to withhold under Exemption 1 did not, in his or her view, qualify for classification under the standards of Executive Order 12356 because it was already publicly available or did not

otherwise require protection in the interest of national security.

That, however, is not the case before us. We have only an "unclassified" label attached to the documents by the ambassadors without a hint as to their rationales for arriving at such a classification. It may be, as the Eaves affidavit notes, that most ambassadors sent their responses back unclassified because that was the label on the questionnaire itself. J.A. 221. But even assuming that we must credit those classifications as the product of the kind of conscious decisionmaking the Foreign Affairs Manual contemplates,[10] without more these earlier decisions cannot raise a material issue of fact about the validity of the later decision in view of the explicit authority for such reclassifications. To defeat summary judgment here, Goldberg needed more direct or extrinsic evidence from the ambassadors or others, that the later classification was in error.

Without denying that the Eaves affidavit would have been more helpful if it had directly addressed the fact that the majority of the cables were initially labelled "unclassified,"[11] we nonetheless conclude that the State Department's burden in this case did not extend to explaining why its reclassification decision departed from the prior, *unexplained* decisions of its ambassadors. Neither FOIA nor Executive Order 12356

---

9. The district court found it unnecessary to determine whether a United States ambassador stationed abroad, or Mr. Eaves in his Washington, D.C. office, is best qualified to determine whether the ambassador's questionnaire responses should be classified. The issue for the court is not who had the ultimate authority to reclassify, but whether the present classification is a correct one.

10. *See* 5 FAM § 933.3, J.A. 143. The Foreign Affairs Manual also says that the label "limited official use" should not be used to identify classified materials, yet thirty-five ambassadors used that term, rather than leaving their cables unmarked or labeling them either "unclassified" or "confidential"—the approved terms of art. *See supra* note 4. It is unclear what inference, if any, we should draw from those markings.

11. For example, in this case, the Eaves affidavit claimed that certain "foreign government information" had been withheld pursuant to § 1.3(c)

of Executive Order 12356, *see, e.g.,* J.A. at 288–90 (Australia), because "[d]isclosure of information given in confidence by one government would lessen our prospects of receiving further information and cooperation not only from that government but from others as well, since a breach of confidence of this nature would not go unnoticed in diplomatic circles," J.A. 227. It certainly would have been helpful to the court in deciding whether summary judgment was appropriate, if the Eaves affidavit had provided some explanation of why Eaves knew but the ambassador did not or did not consider relevant, that the information had been provided in confidence. *See* J.A. 288 (Australia questionnaire response originally marked "unclassified"). Although the omission is essentially harmless in this case, because we agree that information concerning a "possible new agreement with the Government of Australia," J.A. 289, was properly withheld, agency affidavits should generally provide reasoned explanations for discrepancies of this sort.

impose any additional requirements on agencies when they reclassify documents than when they initially classify them pursuant to a FOIA request. In order to controvert a reclassification decision, a FOIA petitioner must do more than point to evidence that the information sought was at some previous time classified differently. His contrary evidence must somehow undermine or call into question the correctness of the classification status of the withheld information, or the agency's explanation for the classification. The Eaves affidavit carefully explained why certain portions of the documents were properly classified and Goldberg's evidence simply does not controvert those explanations.

### IV. CONCLUSION

Goldberg has presented a novel and interesting challenge to the District Court's decision upholding summary judgment for the government, by asserting that a demonstrable conflict within an agency as to the proper classification status of a withheld document raises a genuine issue as to a material fact and warrants to a trial. On the facts of this case, however, Goldberg cannot prevail. We do not accept his argument that the affixing of conclusory "unclassified" labels on responses to an unclassified questionnaire *by itself* controverts a detailed review and explanation that some parts of those documents are properly classified.

Because we find that there is insufficient evidence in the record to controvert the agency's affidavit, we affirm the District Court's decision granting summary judgment.