NEW YORK TIMES
COMPANY, Appellee,

v.

NATIONAL AERONAUTICS AND
SPACE ADMINISTRATION,
Appellant.

No. 87–5244.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 4, 1987.

Decided July 29, 1988.

Al J. Daniel, Jr., Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellant.

Patrick J. Carome, with whom Timothy B. Dyk and George Freeman were on the brief, for appellee. Kerry W. Kirchner, Washington, D.C., also entered an appearance for appellee.

Before ROBINSON, EDWARDS, and DOUGLAS H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBINSON.

Dissenting Opinion filed by Circuit Judge DOUGLAS H. GINSBURG.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The question confronting us is whether a tape of voice communications aboard space shuttle Challenger during its final ill-fated flight is subject to mandatory public disclosure pursuant to the Freedom of Informa-

tion Act (FOIA).[1] The District Court rejected a claim of statutory exemption and ordered release of the tape. We affirm.

## I

On January 28, 1986, Challenger self-destructed seventy-three seconds after liftoff, and all seven astronauts aboard were killed. Public interest in this lamentable event was intense, and media coverage was extensive. Eventually, the New York Times (the Times), invoking FOIA, requested the National Aeronautics and Space Administration (NASA) to furnish "transcripts of all voice and data communications recorded aboard the space shuttle Challenger" on the day of the tragedy, and, as well, copies of voice communications tapes.[2] NASA provided the Times with a written transcript of the only voice recording that was made,[3] but, relying exclusively upon FOIA's Exemption 6,[4] refused to supply a copy of the tape itself.[5] NASA asserted that release of the tape would encroach upon the personal privacy of the astronauts' families by subjecting them to

replay of the voices of their loved ones, "an intrusion on their grief which certainly would exacerbate feelings of hurt and loss."[6] An administrative appeal by the Times was denied, again on the basis of Exemption 6.[7]

The Times then sued in the District Court for release of the voice communications tape.[8] On cross-motions for summary judgment, the court ordered disclosure.[9] Since the voice recording contained no personal information about the astronauts or their families, the court reasoned that it was not a "similar" file within the meaning of Exemption 6.[10]

## II

■ By virtue of Exemption 6, FOIA's disclosure requirement does not apply to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."[11] The analysis involves two steps. The threshold question is whether the material at issue is contained

---

1. 5 U.S.C. § 552 (1982).

2. Letter from David E. Sanger to Shirley Green (July 18, 1986), Joint Appendix (J.App.) 36. Challenger was outfitted with three inflight digital tape recorders, each of which performed a separate function. One monitored payload data, another monitored main engine data, and the third—the "OPS 2" system involved here—recorded the astronauts' voices. Brief for Appellant at 4; Declaration of Robert W. Moorehead ¶ 2 (Jan. 27, 1987), Exhibit 1 to Defendant's Statement of Material Facts, *New York Times Co. v. NASA*, Civ. No. 86–2860 (D.D.C.) (filed Jan. 30, 1987), J.App. 105 [hereinafter Moorehead Declaration]. The OPS 2 system, which used voice-activated microphones mounted inside the astronauts' helmets, began recording at 8 minutes and 25 seconds prior to launch, and continued until the shuttle lost power 73 seconds after launch. Brief for Appellant at 4; Moorehead Declaration, *supra*, ¶¶ 2, 3. The tape suffered some damage from submersion in salt water for 43 days before it was recovered, but NASA was able to produce a useable copy, which thereafter was transcribed. Brief for Appellant at 5–6; Moorehead Declaration, *supra*, ¶¶ 3, 4, 11.

3. See Letter from Lillian R. Levy to David E. Sanger (Aug. 1, 1986), J.App. 37–38 [hereinafter Levy Letter].

4. 5 U.S.C. § 552(b)(6) (1982), quoted in text *infra* at note 11.

5. Levy Letter, *supra* note 3, at 1, J.App. 37.

6. *Id.*

7. See Letter from Ann Bradley to David E. Sanger (Sept. 30, 1986), J.App. 46–50.

8. See Complaint, *New York Times Co. v. NASA*, Civ. No. 86–2860 (D.D.C.) (filed Oct. 20, 1986), J.App. 5–8.

9. *New York Times Co. v. NASA*, 679 F.Supp. 33, 37 (D.D.C.1987).

10. *Id.* at 36.

11. 5 U.S.C. § 552(b)(6) (1982). The agency carries the burden of persuading the court that exemption on this account is appropriate. *Goldberg v. Department of State*, 260 U.S.App. D.C. 205, 210, 818 F.2d 71, 76 (1987), *cert. denied,* — U.S. —, 108 S.Ct. 1075, 99 L.Ed.2d 234 (1988); *Ripskis v. HUD*, 241 U.S.App.D.C. 8, 10, 746 F.2d 1, 3 (1984); *Getman v. NLRB*, 146 U.S.App.D.C. 209, 212, 450 F.2d 670, 673 (1971).

in a personnel, medical, or similar file.[12] If it is, the court must then balance the individual and governmental interests involved in order to determine whether disclosure would constitute a clearly unwarranted invasion of personal privacy.[13] Because the District Court held that Challenger's voice tape did not satisfy the threshold requirement, it never reached the second stage of the test.[14]

■ NASA contends that the District Court erred in concluding that the voice tape contained no personal information about the astronauts and for that reason was not a similar file.[15] NASA argues that the human voice, being unique to each individual, "clearly is information about the individual and identifiable as such."[16] In other words, NASA theorizes that the characteristics placing this tape within the similar-files category of Exemption 6 are "the sound and inflection of [the astronauts'] voices."[17] Accordingly, NASA presses us to hold that the recording is a similar file, and to remand the case for the District Court's determination of whether its release would cause a clearly unwarranted invasion of personal privacy.

According to the Times, "[t]he language and legislative history of Exemption 6 shows that the 'similar files' requirement draws a critical distinction between records containing 'personal information' and records that document only official government activity."[18] Consequently, the Times urges us to focus on the content of the tape, not on the fact that the information is communicated in verbal rather than written form. Because the words gathered on the tape relate only to Challenger's launch and therefore are nonpersonal, the Times argues that the tape is not a "similar" file, and so must be disclosed.

This is an atypical FOIA case. At issue is a voice recording, a transcript of which has already been released by NASA. It is undisputed that the tape reflects nothing concerning the personal lives of the astronauts or members of their families, and that the words spoken pertain only to the launch.[19] Furthermore, NASA admits that inflections of the astronauts' voices do not reveal any appreciable information not available through the transcript:[20]

The declarations submitted by NASA indicate that the voices of the astronauts in this case do not convey any significant information beyond the words spoken, but that does not detract from the *personal* quality of the voices, and their identifiability with particular persons, which is alone sufficient to satisfy the

12. See *Department of State v. Washington Post Co.,* 456 U.S. 595, 598, 102 S.Ct. 1957, 1959, 72 L.Ed.2d 358, 362 (1982); *Washington Post Co. v. HHS,* 223 U.S.App.D.C. 139, 147, 690 F.2d 252, 260 (1982).

13. See *Department of State v. Washington Post Co., supra* note 12, 456 U.S. at 598, 102 S.Ct. at 1959, 72 L.Ed.2d at 362; *Washington Post Co. v. HHS, supra* note 12, 223 U.S.App.D.C. at 147, 690 F.2d at 260.

14. See *New York Times Co. v. NASA, supra* note 9, 679 F.Supp. at 36 n. 6.

15. Brief for Appellant at 15.

16. *Id.*

17. *Id.* at 25.

18. Brief for Appellee at 9.

19. NASA does not dispute the Times' assertion that "[t]he words spoken on the withheld tape are observations and communications of certain of the Challenger astronauts concerning the launching of the space shuttle. The withheld tape contains no information about the personal lives of the Challenger astronauts or any of their family members." See New York Times Company's Statement of Material Facts ¶ 6, *New York Times Co. v. NASA,* Civ. No. 86–2860 (D.D.C.) (filed Dec. 22, 1986), J.App. 27; Defendant's Statement of Genuine Issues Concerning Plaintiff's Statement of Material Facts ¶ 1, *New York Times Co. v. NASA,* Civ. No. 86–2860 (D.D.C.) (filed Jan. 30, 1987), J.App. 100; see Transcript of the Challenger Crew Comments from the Operational Recorder, J.App. 39–43.

20. This is not a case in which release of the tape will reveal the otherwise-unknown identity of the individual speaking. The identities of the astronauts are, in fact, disclosed in the transcript. See Transcript of the Challenger Crew Comments from the Operational Recorder, J.App. 39–43.

"similar files" requirement of Exemption 6.[21]

Thus, NASA's Exemption 6 claim arises, not because of the information recorded on the tape, but rather because that information is conveyed orally. We thus must decide whether the sound of the human voice communicating nonpersonal information will alone raise the tape to the level of a "similar" file for purposes of Exemption 6.

### III

For guidance in construing the phrase "similar files" in Exemption 6, we must look, as the District Court did, to the Supreme Court's decision in *Department of State v. Washington Post Co.*[22] There the Court held that records reputedly establishing the citizenship status of two Iranians living in Iran would constitute similar files.[23] This court previously had interpreted "similar files" as including only agency records containing information as personal or intimate in nature as that found in personnel or medical files.[24] Drawing on legislative history, however, the Supreme Court concluded that Congress did not intend to limit "similar files" "to a narrow class of files containing only a discrete kind of personal information."[25] On the contrary, the Court said,

[t]he House and Senate Reports, although not defining the phrase "similar files," suggest that Congress' primary purpose in enacting Exemption 6 was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information. After referring to the "great

quantities of [Federal Government] files containing intimate details about millions of citizens," the House Report explains that the exemption is "general" in nature and seeks to protect individuals....[26]

Accordingly, the Court explained, "Congress' statements that it was creating a 'general exemption' for information contained in 'great quantities of files' ... suggest that the phrase 'similar files' was to have a broad, rather than a narrow, meaning."[27] Thus the Court made clear that a record need not contain highly personal information or intimate details in order to be a similar file for purposes of Exemption 6.

The Court, however, did not discard the threshold test of similarity entirely. Indeed, the Court stated specifically that its decision should not be taken as an evisceration of the first stage of the Exemption 6 analysis:

This construction of Exemption 6 will not render meaningless the threshold requirement that information be contained in personnel, medical, and similar files by reducing it to a test which fails to screen out any information that will not be screened out by the balancing of private against public interests.... [T]here are undoubtedly many Government files which contain *information not personal to any particular individual,* the disclosure of which would nonetheless cause embarrassment to certain persons. *Information unrelated to any particular person* presumably would not satisfy the

**21.** Brief for Appellant at 25 n. 10 (emphasis in original) (citing Declaration of Robert L. Crippen ¶ 5 (Jan. 27, 1987), Exhibit 2 to Defendant's Statement of Material Facts, *New York Times Co. v. NASA,* Civ. No. 86–2860 (D.D.C.) (filed Jan. 30, 1987), J.App. 143 ("[n]othing in any voice inflection on the tape indicates that any member of the crew was aware that any problem existed at any time")).

**22.** *Supra* note 12.

**23.** 456 U.S. at 602, 102 S.Ct. at 1961, 72 L.Ed.2d at 364.

**24.** *Washington Post Co. v. Department of State,* 207 U.S.App.D.C. 372, 373–374, 647 F.2d 197, 198–199 (1981), *rev'd* 456 U.S. 595, 102 S.Ct.

1957, 72 L.Ed.2d 358 (1982); see also *Simpson v. Vance,* 208 U.S.App.D.C. 270, 273, 648 F.2d 10, 13 (1980); *Board of Trade v. Commodity Futures Trading Comm'n,* 200 U.S.App.D.C. 339, 346, 627 F.2d 392, 399 (1980).

**25.** *Department of State v. Washington Post Co., supra* note 12, 456 U.S. at 602, 102 S.Ct. at 1961, 72 L.Ed.2d at 364.

**26.** *Id.* at 599, 102 S.Ct. at 1960, 72 L.Ed.2d at 362–363.

**27.** *Id.* at 600, 102 S.Ct. at 1960–1961, 72 L.Ed.2d at 363.

threshold test.[28]

Applying in this case the Supreme Court's ruling in *Washington Post*, the District Court reasoned:

> In sum, notwithstanding its broad construction of the phrase "similar files", the Supreme Court has not eliminated the fundamental requirement that a government record contain personal information about an individual before it can be considered a "similar file" within the meaning of Exemption 6. Since it is undisputed that the Challenger tape at issue here contains no such information about the astronauts or their family members, the tape does not satisfy the threshold requirement for protection under Exemption 6 and must, therefore, be released under the disclosure requirements of the FOIA.[29]

NASA asserts that because the tape incorporates identifiable human voices, it is "related to" and "personal to" particular individuals and as such it surmounts the "similar files" threshold.[30] We disagree. The Supreme Court's treatment in *Washington Post* of the legislative history of Exemption 6 leads us to conclude that a file is not to be considered "similar" unless at a minimum it contains personal information—information somehow related to an individual's life. To call the sound of a human voice "personal information" distorts the plain meaning and common understanding of the phrase, as well as the meaning Congress ascribed to it. As such, the tape recording of the voices of the astronauts in this case, without more, does not constitute a similar file.

In *Washington Post*, the Supreme Court emphasized that "Congress' primary purpose in enacting Exemption 6 was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of *personal information*."[31] The Court quoted from the House Report, which revealed that Exemption 6 " '[was] intended to cover detailed government records *on an individual* which can be identified as applying to that individual.' "[32] The Court also cited *Department of Air Force v. Rose*,[33] in which the Court had noted that "the primary concern of Congress in drafting Exemption 6 was to provide for the confidentiality of *personal matters*."[34] The Court thus has made clear that a record must contain information about a particular person in order to be a similar file.

Perhaps most telling is the Court's language in *Washington Post* when it delineated the character of Exemption 6's "similar files" requirement. "Information unrelated to any particular person," the Court declared, "presumably would not satisfy the threshold test."[35] The information captured on the voice recording here at issue bears significance only with respect to the launch of the space shuttle. Although these data are preserved verbally, the tape contains no information about any astronaut beyond participation in the launch.[36]

---

**28.** *Id.* at 602 n. 4, 102 S.Ct. at 1962 n. 4, 72 L.Ed.2d at 365 n. 4 (emphasis added).

**29.** *New York Times Co. v. NASA, supra* note 9, 679 F.Supp. at 36.

**30.** Brief for Appellant at 12.

**31.** 456 U.S. at 599, 102 S.Ct. at 1960, 72 L.Ed.2d at 362–363 (emphasis added).

**32.** *Id.* at 602, 102 S.Ct. at 1961, 72 L.Ed.2d at 364 (quoting H.R.Rep. No. 1497, 89th Cong., 2d Sess. 11 (1966) U.S.Code Cong. & Admin.News 1966, pp. 2418, 2428) (emphasis added).

**33.** 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976).

**34.** 456 U.S. at 599–600, 102 S.Ct. at 1960, 72 L.Ed.2d at 363 (quoting *Department of Air Force v. Rose, supra* note 33, 425 U.S. at 375 n. 14, 96 S.Ct. at 1606 n. 14, 48 L.Ed.2d at 29 n. 14) (emphasis added); see also *Washington Post Co. v. HHS, supra* note 12, 223 U.S.App.D.C. at 147, 690 F.2d at 260 (similar files threshold "ensures that FOIA's protection of personal privacy is not affected by the happenstance of the type of record in which *personal information* is stored") (emphasis added).

**35.** 456 U.S. at 602 n. 4, 102 S.Ct. at 1962 n. 4, 72 L.Ed.2d at 365 n. 4.

**36.** See note 19 *supra* and text accompanying notes 19–21 *supra*.

We conclude that the information recorded on the tape is "unrelated to any particular person" and therefore is not a similar file.

To accept NASA's divergent argument would be to hold that every tape recording of audible human utterances, regardless of its content, is invariably a similar file because every person's voice is essentially unique. If, for example, a governmental official gave a public speech about the activities of a governmental agency, a tape of the speech automatically would be a similar file despite the fact that it contains no information personal to the official or anyone else. Mere shifting of the focus from the nature of the information recorded to the manner in which that information was conveyed would in this case render the similar-files threshold meaningless.

Moreover, accreditation of NASA's argument that the uniqueness of the individual astronauts' voices renders the tape a similar file would lead to incongruous results in analogous contexts. Since handwriting is identifiable as the work of a particular individual, by NASA's reasoning every handwritten document would also become a similar file. Likewise, a printed or typewritten document bearing someone's fingerprints, which, just as human voices, are unique to each individual, would also be a similar file. In each instance the same conclusion would be foregone, and in combination the threshold of "personal information" would be ravaged. This much too expansive reading of *Washington Post* cannot be sustained.

NASA points to the comment in *Washington Post Co. v. HHS* that the similar-files requirement "is fairly minimal."[37] We agree, but that is not to say that the threshold test is nonexistent. To cross the threshold, a record need only incorporate information about an individual that is "personal" in the sense contemplated by Exemption 6. Challenger's voice communications tape contains no such information, and thus is not a similar file. Failing to meet the threshold precondition for protection under Exemption 6, the tape must be disclosed.

The judgment appealed from is accordingly

*Affirmed.*

D.H. GINSBURG, Circuit Judge, dissenting:

Under clear Supreme Court precedent, NASA need not disclose "information which applies to a particular individual" if its disclosure "would constitute a clearly unwarranted invasion of personal privacy." *Department of State v. Washington Post Co.*, 456 U.S. 595, 102 S.Ct. 1957, 72 L.Ed. 2d 358 (1982); 5 U.S.C. § 552(b)(6) (1982). I believe that a tape of the voices of the Challenger crew meets the threshold test of applying to a particular individual. Accordingly, NASA should be given the opportunity to show, if it can, that release of the tape would invade the privacy of the families of the deceased astronauts, as it claims. Therefore, I dissent from the court's decision that NASA must release the information without regard to its effect on those individuals.

I

On January 28, 1986, Gregory B. Jarvis, Christa McAuliffe, Ronald E. McNair, Ellison S. Onizuka, Judith A. Resnik, Francis R. Scobee, and Michael J. Smith perished in the explosion of the space shuttle Challenger. Media coverage of the disaster was intensive and extensive; the appellee, New York Times, alone has published more than 600 articles on this tragedy and its aftermath. Among these articles was a lengthy account of the continuing effect of the disaster, a year later, on the crew members' families, describing in detail their grief and their attempt to cope with the loss of their loved ones. *See Astronauts' Families Still Struggle With Grief and Finance*, N.Y. Times, Jan. 6, 1987, p. C1, col. 1.

Some weeks after the tragedy, NASA was able to locate and recover from the ocean floor a tape recording of voice communications among the Challenger crew

---

**37.**  223 U.S.App.D.C. at 147, 690 F.2d at 260.

and between the crew and ground control before and during the ill-fated flight. The Times asked for a duplicate of the tape. NASA declined that request, but did provide the Times with a transcript of the tape. In a letter to the Times, NASA claimed that giving the news media a copy of the audio tape itself would subject the astronauts' families "to hearing the voices of their loved ones, an intrusion on their grief which would certainly exacerbate feelings of hurt and loss." Unsatisfied, the Times filed suit in the district court, invoking the Freedom of Information Act (FOIA).

The Times claims that "a voice communication tape is essential to fully understand an aircraft accident and to evaluate appropriate corrective measures." The transcript alone is insufficient, the Times argues, because "[t]he tape contains important information which NASA's transcript —even if it were totally accurate—cannot bring to public light," such as "voice inflections" and background noises from the Challenger's rocket boosters. This information, the Times contends, will enable the public to verify NASA's conclusions that "the astronauts had no advance warning of a problem and that the sounds from the engines were not 'unusual.'"

In response to this claim, NASA argues —the court says "admits"—that "the voices of the astronauts ... do not convey any significant information beyond the words spoken...." The only other information that disclosure of the tape would reveal is the sound and inflection of the crew's voices during the last seconds of their lives, which NASA maintains is exempt from disclosure under the FOIA essentially because its release would occasion "a clearly unwarranted invasion of personal privacy."

The district court rejected NASA's argument on the ground that the tape "contains no information about the astronauts or their family members," therefore is not a "personal, medical or *similar* file" within the meaning of Exemption 6 of the FOIA, and therefore must be disclosed regardless. of whether such disclosure would unduly

invade anyone's personal privacy. *New York Times v. NASA,* 679 F.Supp. 33, 36 (D.D.C.1987). Our court follows the district court down this path to error.

II

Under the FOIA, information in government files must be disclosed, upon request, to the public and the press unless it comes within one of the specific exemptions in the statute. Exemption 6 allows an agency to withhold information meeting two criteria: it is [1] contained in "personnel and medical files and similar files [2] the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (1982). Although the first criterion seems to focus on the particular type of agency file involved, the Supreme Court has held, without dissent, that it is satisfied if the requested information, however it is stored, "applies to a particular individual." *Washington Post Co.,* 456 U.S. at 602, 102 S.Ct. at 1961. The Supreme Court explained:

> Under the plain language of the exemption, *nonintimate information about a particular individual* which happens to be contained in a personnel or medical file can be withheld if its release would constitute a clearly unwarranted invasion of personal privacy. And yet, under respondent's view of the exemption, the very same information, being non-intimate and therefore not within the "similar files" language, would be subject to mandatory disclosure if it happened to be contained in records other than personnel or medical files. "[T]he protection of an individual's right of privacy" which Congress sought to achieve by preventing "the disclosure of [information] which might harm the individual," H.R.Rep. No. 1497 [89th Cong., 2d Sess.] at 11 [ (1966) ], surely was not intended to turn upon the label of the file which contains the damaging information.

> \* \* \* \* \* \*

In sum, we do not think that Congress meant to limit Exemption 6 to a narrow class of files containing only a discrete kind of personal information.... When

disclosure of *information which applies to a particular individual* is sought from Government records, courts must determine whether the release of the information would constitute a clearly unwarranted invasion of privacy.

*Id.* at 601–02, 102 S.Ct. at 1962 (footnote omitted) (emphases added).

The Supreme Court could not have been clearer that the Congress intended that "the phrase 'similar files' was to have a broad, rather than a narrow, meaning." *Id.* at 600, 102 S.Ct. at 1961. Yet the Court today adds to this low threshold test a new barrier of uncertain height: "To cross the [similar files] threshold, a record [must] incorporate information *about an individual* that is *'personal'* in the sense contemplated by Exemption 6." Court Opinion (Court Op.) at 607. (emphases added). Whatever else this use of "personal" means, it is apparently something more than the Supreme Court's test that the information merely "applies to a particular individual"; for the information that the Times has requested in this case clearly satisfies that test.

What does this court's use of the adjective "personal" add to the meaning of the Supreme Court's "similar files" threshold? In dictionary terms, the phrase "about an individual" and the word "personal" are virtually synonymous. *See, e.g.,* Webster's Ninth New Collegiate Dictionary at 877 (1983) (defining "personal" as "of, relating to, or affecting a person"); Webster's New Universal Unabridged Dictionary 1338 (1979) (defining "personal" as "belonging to human beings, not to things or abstractions"). The court, however, means by "personal" something more than "about an individual" since it actually uses both phrases in the same breath. The inflection of a voice, moreover, if it conveys anything at all, conveys something "about an individual." Likewise, the court must use "personal" to mean more than "belonging to human beings," since an identified individual's voice obviously belongs to a human being. What more is required for information to be "personal," then? We are told that the something more is that which "is contemplated by Exemption 6," but the

only indication of what this means is the court's suggestion that "personal" information is that which is "somehow related to an individual's life." Court Op. at 606.

Indulging the court in its own terms, I find it inconceivable that the "sound and inflection" of a person's voice during the last seconds of his or her life is not information that "somehow relates to an individual's life." Indeed, both NASA and the Times contend that this information reveals whether the astronauts were aware of their impending fate—information that the Times argues is not revealed in the transcript. The court fails to explain why this is not information "somehow related to an individual's life."

NASA "admits" that the tape "contains no information about the personal lives of the Challenger astronauts or any of their family members," Defendant's Statement of Genuine Issues Concerning Plaintiff's Statement of Material Fact as to Which Plaintiff Claims There is No Genuine Issue, but it argues that the astronauts' individually recognizable voices constitute "personal information which relates to those individuals; indeed the Times wants the tape *because* it contains information personal to those astronauts."

This seems too obvious to dispute, and the court does not try to do so. Instead, it mischaracterizes the nature of the information that the Times has requested: "NASA's Exemption 6 claim arises, not because of the information recorded on the tape, but rather because that information is conveyed orally." Court Op. at 605. It therefore accepts uncritically the Times' assertion that the tape "document[s] only official government activity," *id.* at 604, and all too easily concludes that the "information recorded on the tape is 'unrelated to any particular person'...." *Id.* at 607. This characterization fails completely to acknowledge the distinction between the information conveyed by the sound and inflection of the astronauts' voices and the information conveyed by the words the astronauts spoke. While the words they spoke are set down in the transcript that

NASA has released, the timbre of their voices is not. Whatever insights can be gleaned from their voices, whatever inferences can be drawn about their thoughts and feelings at the very moment of their deaths, they are not to be found in that transcript; if they are anywhere, they are in the tape. So the meaning of Mark Antony's speech over the body of Caesar is not to be found in the words on the printed page but in the voice that contradicts them. That is why the Times wants the tape, and that is why it is pure fiction for the court to pretend that the voices in the tape are "unrelated to any particular person." *

Even if we were to ignore that the tape was recorded in the last moments of the crew's lives, I should still think that the sound and inflection of an individual's voice is information that "applies to a particular individual." Suppose, for example, that a NASA analyst had examined the tape and written a report describing each astronaut's voice. The report might read in part as follows: "Astronaut A has a high, reedy voice, and she tends to slur certain syllables. At various points in the short flight of the Challenger, her voice reveals her exhilaration, intensity, and sense of mission." Could it be seriously doubted that this is information that "applies to a particular individual"? No. And by the court's own lights, it would make no difference that the information is stored in this form rather than in its raw, audio form. I therefore do not understand, and the court does not explain, how it can say that "[t]o call the sound of a human voice 'personal information' distorts the plain meaning and common understanding of the phrase, as well as the meaning Congress ascribed to it." Court Op. at 606. It would appear that this Court simply disagrees with the Supreme Court's decision that the "similar files" threshold is not limited to information that is "highly personal" or "intimate," *Washington Post*, 456 U.S. at 598,

102 S.Ct. at 1959–60 (quoting, and reversing, this court); hence the court resurrects that limitation in another, even more opaque guise.

We know from the Supreme Court's *Washington Post* decision that information the release of which might constitute an invasion of personal privacy includes whether an individual is a United States citizen, and "[i]nformation such as place of birth, date of birth, date of marriage, employment history, and comparable data [that] is not normally regarded as highly personal." *Id.* at 600, 102 S.Ct. at 1961. Yet, we are told that an individual's voice, which the court acknowledges is "essentially unique," is different because it does not contain personal information—information "somehow related to an individual's life." What, then, does the court consider to be "personal" information? Where is the distinction between the non-personal voice and the personal citizenship, date of birth, and place of birth? As I have shown, it cannot be that the latter data are all "somehow related to an individual's life," while an individual's voice is "unrelated to any particular person." Court Op. at 606.

Perhaps the court's failure to follow the way so obviously laid out for us by the Supreme Court can be explained (but surely not justified) by its apparent concern that Exemption 6 will become a cover for unwarranted government secrecy, a high and wide barrier between the public and the government that serves it, defeating the underlying purpose of the FOIA. *See* Court Op. at 606–07. Putting aside our lack of authority to ignore Supreme Court decisions, or to limit them to their facts as the court in practice limits *Washington Post* today, this fear is simply unfounded. That the requested information is contained in a "similar file" is only a threshold determination; it does not follow, without a good deal more, that an agency can with-

---

* The Times also apparently disputes the accuracy of the transcript NASA released and the agency's conclusion that the tape offers no additional information as to what the astronauts knew or as to the cause of the disaster. Insofar as the accuracy of the transcript and the agency's characterization of it are in issue, however, the district court could independently verify the agency's representations *in camera,* weigh release of any corrections or additions to the transcript, and thus ensure that the public receives all the information that the FOIA guarantees it, without compromising protected privacy interests.

hold it. The agency may withhold the information *only* if it can demonstrate, in court, subject to adversarial testing, that disclosure "would constitute a clearly unwarranted invasion of personal privacy."

Thus, there is nothing "incongruous" if such records as a tape of an official speech or a handwritten letter meet the threshold established by the Supreme Court because the voice on the tape or the handwriting in the letter "applies to a particular individual." First, of course, the written text of the speech or a typewritten version of the letter, like the transcript in this case, would ordinarily supply all of the information sought by the person requesting it. Second, if the request were specifically for the audio tape of the speech or the holographic version of the letter, a "similar file" would be involved, but it seems highly unlikely that the agency could show that its disclosure of the originals would implicate any significant privacy interest beyond that entailed in disclosure of the typewritten versions. If, in fact, its release would "constitute a clearly unwarranted invasion of personal privacy," however, then it should be exempt from disclosure for that is what the Congress provided in Exemption 6.

As the Supreme Court emphasized:

[T]he Senate Judiciary Committee reached a "consensus that ... [personal] files should not be opened to the public, and ... decided upon a *general exemption* rather than a number of specific statutory authorizations for various agencies." S.Rep. No. 813, 89th Cong., 1st Sess., 9 (1965) (emphasis added). The Committee concluded that the balancing of private against public interests, not the nature of the files in which the information was contained, should limit the scope of the exemption: "It is believed that the scope of the exemption is held within bounds by the use of the limitation of 'a clearly unwarranted invasion of personal privacy.'" Thus, "the primary concern of Congress in drafting Exemption 6 was to provide for the confidentiality of personal matters." *Department of Air Force v. Rose,* 425 U.S. 352, 375,

n. 14, 96 S.Ct. 1592, 1606 n. 14, 48 L.Ed. 2d 11 (1976).

\* \* \* \* \* \*

Had the words "similar files" been intended to be only a narrow addition to "personnel and medical files," there would seem to be no reason for concern about the exemption's being "held within bounds," and there surely would be clear suggestions in the legislative history that such a narrow meaning was intended. *Washington Post Co.,* 456 U.S. at 599–600, 102 S.Ct. at 1960–61.

In the face of this precedent, the court professes to agree—it could hardly do otherwise—that the similar files requirement is "fairly minimal." *See* Court Op. at 607. Yet it offers no principled reason why the sound of an individual's voice does not convey information that "applies to a particular individual," and why the tape is not for that reason alone a "similar file" within the meaning of Exemption 6.

### III

In its haste to avoid a "much too expansive reading of *Washington Post,*" Court Op. at 607, the court overlooks the primary purpose of Exemption 6. As the Supreme Court made clear in that case, the exemption was intended to protect the privacy of individuals to whom the information in a requested record pertains. This court's cryptic insistence that the record must contain some unspecified type of information that the court deems "personal" undermines the exemption without advancing the larger purpose of the FOIA to avoid unwarranted secrecy in government.

Whether disclosure of the Challenger tape in this case would constitute a clearly unwarranted invasion of privacy, we do not know and cannot discern on the record before us. The families of the astronauts attempted to explain *in camera* the basis for their privacy claims, but the district court rejected their affidavits because, like this court today, it truncated its analysis of the Exemption 6 claim at the threshold. I would remand this case for the district court to determine whether any invasion of

privacy that the disclosure of the Challenger tape will cause is or is not "clearly unwarranted." *See Washington Post Co.*, 456 U.S. at 603, 102 S.Ct. at 1962.