**NEW YORK TIMES
COMPANY, Appellee,**

v.

**NATIONAL AERONAUTICS AND
SPACE ADMINISTRATION,
Appellant.**

No. 87–5244.

United States Court of Appeals,
District of Columbia Circuit.

Argued En Banc April 25, 1990.

Decided Dec. 7, 1990.

Bruce G. Forrest, Atty., U.S. Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Leonard Schaitman, Washington, D.C., Atty., U.S. Dept. of Justice, were on the brief, for appellant. Al J. Daniel, Jr., Washington, D.C., Atty., U.S. Dept. of Justice, also entered an appearance for appellant.

Patrick J. Carome, with whom Timothy B. Dyk and George Freeman, Washington, D.C., were on the brief, for appellee. Kerry W. Kircher and A. Douglas Melamed, Washington, D.C., entered appearances, for appellee.

Before WALD, Chief Judge, MIKVA, EDWARDS, RUTH BADER GINSBURG, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, SENTELLE and THOMAS, Circuit Judges, and ROBINSON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG, in which Circuit Judges SILBERMAN, BUCKLEY, WILLIAMS, SENTELLE, and THOMAS concur.

Dissenting opinion filed by Circuit Judge EDWARDS, in which Chief Judge WALD, Circuit Judges MIKVA and RUTH BADER GINSBURG, and Senior Circuit Judge ROBINSON concur.

D.H. GINSBURG, Circuit Judge:

This case involves a claim under Exemption 6 of the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(6), by which NASA seeks to withhold a tape of voice communications aboard the brief and tragic flight of the Challenger space shuttle. The district court held that the tape failed the threshold test for Exemption 6 because it was not within the category of "personnel and medical files and similar files" to which the exemption applies, and ordered the release of the tape. *New York Times Co. v. NASA*, 679 F.Supp. 33, 36 (1987). That decision was initially affirmed by a divided panel of this court. 852 F.2d 602 (1988). We now reverse.

Under controlling Supreme Court precedent, NASA need not disclose "information which applies to a particular individual" if its disclosure "would constitute a clearly unwarranted invasion of personal privacy." *Department of State v. Washington Post Co.*, 456 U.S. 595, 602, 102 S.Ct. 1957, 1961–62, 72 L.Ed.2d 358 (1982); 5 U.S.C. § 552(b)(6). We believe that a tape of the voices of the Challenger crew meets the threshold test: it applies to particular individuals. Accordingly, NASA is entitled to an opportunity to prove its claim that release of the tape would invade the privacy of the deceased astronauts, or of their families. We therefore remand this case for the district court to consider the strength of the private and public interests involved before deciding whether NASA must release the Challenger tape.

## I. BACKGROUND

On January 28, 1986, Gregory B. Jarvis, Christa McAuliffe, Ronald E. McNair, Ellison S. Onizuka, Judith A. Resnik, Francis R. Scobee, and Michael J. Smith perished in the explosion of the space shuttle Challenger. Media coverage of the disaster was intensive and extensive; the appellee, New York Times, alone published more than 600 articles on this tragedy and its aftermath. Among these articles was a lengthy account of the continuing effect of the disaster, a year later, on the crew members' families, describing in detail their grief and their attempts to cope with the loss of their loved ones. *See Astronauts' Families Still Struggle With Grief and Finance*, N.Y. Times, Jan. 6, 1987, p. C1, col. 1.

Some weeks after the tragedy, NASA was able to locate and recover from the ocean floor a tape recording of voice communications among the Challenger crew and between the crew and ground control before and during the brief flight. The Times asked for a duplicate of the tape. NASA declined that request, but it did provide the Times with a transcript of the tape. In a letter to the Times, NASA claimed that giving the news media a copy of the audio tape itself would subject the astronauts' families "to hearing the voices of their loved ones, an intrusion on their grief which would certainly exacerbate feelings of hurt and loss." Unsatisfied, the Times filed suit in the district court, invoking the FOIA.

In the district court the Times claimed that "a voice communication tape is essential to fully understand an aircraft accident and to evaluate appropriate corrective measures." "The tape," the Times argued, "contains important information which NASA's transcript—even if it were totally accurate—cannot bring to public light," including the astronauts' "voice inflections." Listening to the tape, the Times contended, will enable the public to verify NASA's conclusion that "the astronauts had no advance warning of a problem and that the sounds from the engines were not 'unusual.'" It also pointed out that the words spoken on the tape (as revealed in the transcript) contain no personal information about the astronauts or their families. NASA responded that it was the voice inflections, not the words spoken, that it was seeking to withhold because such inflections are personal to the astronauts.

## II. ANALYSIS

Exemption 6 provides that the disclosure requirements of the FOIA do not apply to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). NASA makes no claim that the tape it seeks to withhold is a personnel or medical file. To come within the protection of Exemption 6, therefore, the tape must first satisfy the threshold requirement of being a "similar file[ ]." Because the district court held that the tape did not constitute such a file, it never reached the second stage of the Exemption 6 analysis—whether the release of the file would result in a clearly unwarranted invasion of privacy.

### A. Similar Files Under Exemption 6

The only question before this court is whether the tape passes the threshold requirement, not the strength of the private and public interests at stake. The nature

of the Times's interest is relevant to the threshold issue, however, because it makes clear that the file contains something beyond the content of the words in the printed transcript—"information which applies to a particular individual," namely his or her voice inflection at a particular moment. Thus, while the taped words do not contain information about the personal lives of the astronauts, disclosure of the file would reveal the sound and inflection of the crew's voices during the last seconds of their lives.[1] Therefore, the tape contains personal information the release of which is subject to the balancing of the public gain against the private harm at which it is purchased.

■ The FOIA makes no distinction between information in lexical and that in non-lexical form; all information is equally covered by the general norm of disclosure, and equally subject to the same specific exemptions therefrom. The lexical and non-lexical aspects of a file may convey different information, however, and when the government asserts that only the non-lexical aspect is exempt from disclosure, the court must consider whether the information that would be newly revealed by that disclosure is or is not exempt. A textual report accompanied by a picture, for example, provides more information than the text of the report alone. In a particular case, the picture might be exempt from disclosure while the text is not (or vice versa).[2]

Lest there be any doubt that voice inflections can contain personal information, recall the 1967 fire in the cockpit of the Apollo 1 spacecraft, which killed Edward H. White, 2d, Roger B. Chaffee, and Virgil I. (Gus) Grissom. In that tragedy, too, NASA had a tape of the last moments of the astronauts' lives. The New York Times was then content, however, to publish an article based solely upon the verbal description given by NASA, without gaining access to the sounds on the tape. Here is how the Times recounted the last few seconds in the cockpit:

> "Fire ... I smell fire," an unidentified astronaut reported over the intercom.
>
> Two seconds passed.
>
> "Fire in the cockpit!" cried Colonel White.
>
> This time the voice was sharp and insistent. It was identified as Colonel White's by Donald K. Slayton, a former astronaut and now chief of crew operations.
>
> There was silence for three seconds— then a hysterical shout from an unidentified astronaut:

---

1. Our dissenting colleagues accept our premise that "voice inflections and other 'non-lexical' information *can* constitute personal information," dis. op. at 1010, but resist the inevitable conclusion: if that information "applies to a particular individual," then it not only can, but *does*, constitute personal information sufficient to satisfy the Exemption 6 threshold as the Supreme Court has interpreted it.

2. The dissent places a puzzling degree of emphasis upon NASA's so-called "concession before the District Court that

> [t]he words spoken on the withheld tape are the observations and communications of certain of the Challenger astronauts concerning the launching of the space shuttle. The withheld tape contains no information about the personal lives of the Challenger astronauts or any of their family members."

Dis. op. at 1010, 1017 (emphasis deleted) (citing Defendant's Statement of Genuine Issues, *New York Times Co. v. NASA*, 679 F.Supp. 33 (D.D.C. 1987) (Civ. No. 86–2860) ¶ 1 (citing Plaintiff's Motion for Summary Judgment, *id.,* ¶ 6)); *see also* dis. op. at 1010.

The quoted passage actually appeared in the statement of undisputed facts that the Times submitted in support of its motion for summary judgment, and that NASA did not explicitly contradict. But the quoted language is at best ambiguous: it could mean either that "the words spoken" on the tape do not contain information about the personal lives of the Challenger astronauts, or that the entire tape, presumably including the sounds and voice inflections of the astronauts, does not contain any personal information. In any event, NASA made its position quite clear before the district court, and we cannot take seriously the suggestion, made for the first time in today's dissenting opinion, that NASA's failure explicitly to contradict the Times's ambiguous statement is the concession-by-negative-pregnant that the dissenters represent it to be. The Times did not treat it as such; and Judge Robinson's opinion for the panel, in which Judge Edwards joined, did not depend upon the supposed concession. 852 F.2d at 604–05.

"There's a bad fire in the spacecraft!"

A longer gap followed, about seven seconds. There were sounds of frantic movement, unintelligible shouting. Finally, after four more seconds, Commander Chaffee cried out the last words of distress: "We're on fire—get us out of here!"

N.Y. Times, Jan. 31, 1967, p. 1. The description alone is chilling. One can hardly doubt that the horror in the voices on the tape would convey additional information that applies to the astronauts in the throes of their deaths.

■ In the *Washington Post* case, this court, in a holding subsequently rejected by the Supreme Court, decided that "to qualify as 'similar' files," within the meaning of Exemption 6, "the recorded data must incorporate 'intimate details' about an individual, information of the same magnitude—as highly personal or as intimate in nature—as that at stake in personnel and medical records." *Washington Post Co. v. Department of State*, 647 F.2d 197, 198–99 (1981) (citations omitted), *rev'd*, 456 U.S. 595, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982). The Supreme Court admonished that in crafting Exemption 6, Congress had "concluded that the balancing of private against public interests ... should limit the scope of the exemption." 456 U.S. at 599, 102 S.Ct. at 1960. Thus the Supreme Court requires that in applying the threshold test, we look "not [to] the nature of the files" that contain the information sought in a FOIA request, but to the nature of the information requested. *Id.* The information need not be intimate; the threshold for application of Exemption 6 is crossed if the information merely "applies to a particular individual." *Id.* at 602, 102 S.Ct. at 1961–62. As this court subsequently put it, the threshold is "minimal." *Washington Post Co. v. HHS*, 690 F.2d 252, 260 (1982) ("This ensures that FOIA's protection of personal privacy is not affected by the happenstance of the type of agency record in which personal information is stored.").

There is, of course, a very good reason why the Exemption 6 threshold was set at a low level: information that fails to cross

that threshold must be released without regard to any invasion of personal privacy that may result, and without regard to whether there is a sufficient public interest in its release to warrant the harm caused by that invasion of privacy. A threshold that excludes too much would undermine what the Supreme Court described as the Congress's objective of "provid[ing] a proper balance between the protection of an individual's right of privacy and the preservation of the public's right to Government information." H.R.Rep. No. 1497, 89th Cong., 2d Sess. 11 (1966), U.S.Code Cong. & Admin.News 1966, 2418, 2428, *quoted in Washington Post*, 456 U.S. at 599, 102 S.Ct. at 1960.

■ The panel opinion affirming the district court rejected NASA's argument that voice inflections constitute personal information because of the perceived consequence that "every tape recording of audible human utterances, regardless of its content, [would be] invariably a similar file.... Mere shifting of the focus from the nature of the information recorded to the manner in which that information was conveyed would in this case render the similar-files threshold meaningless." 852 F.2d at 607. In this the panel twice erred.

First, in treating the words recorded as the totality of the "information ... conveyed," it failed to acknowledge that information is not conveyed by words alone. The information recorded through the capture of a person's voice is distinct and in addition to the information contained in the words themselves. Reading the libretto of a Verdi opera is not the same as hearing the opera performed. So, too, the meaning of Marc Antony's speech over the body of Caesar is not to be found in the disembodied words on the printed page, but in the voice that contradicts them.

Second, it is simply not correct that recognizing non-lexical information as one type of information that can "apply to an individual" would "render the similar files threshold meaningless." Not every government file contains information about an individual. There are surely millions, perhaps billions, of government documents

that say nothing about any individual, being composed instead of financial or scientific data, statistics, crop reports, and so on. Even when such a file does contain information apart from and beyond the content of the words used, it may not be possible to identify the individual to whom that information applies. Or there may be multiple authors, each of whom may have contributed to the file non-lexical information that cannot be traced to, and therefore does not reflect upon, any one person. Examples might include an unidentified voice or likeness in an audio or video tape, or such non-lexical information as might be gleaned from a file compiled by numerous unnamed and unknown government employees. The Government could not cross the similar files threshold to assert a privacy interest in such information.

Indeed, the Supreme Court explains in *Washington Post* that a broad interpretation of what constitutes personal information does "not render meaningless the threshold requirement" that the information be contained in a "similar file." There the Court states:

> As petitioners point out, there are undoubtedly many Government files which contain information not personal to any particular individual, the disclosure of which would nonetheless cause embarrassment to certain persons. Information unrelated to any particular person presumably would not satisfy the threshold test.

456 U.S. at 602 n. 4, 102 S.Ct. at 1962 n. 4. What petitioners in that case had pointed out was that

> Disclosure of financial records of a large corporation might, for example, prove embarrassing to the corporation's officers or board of directors.... But that financial information would not, simply by virtue of the damaging impact, become "personal" information that meets the threshold test of Exemption 6.

Pet.Br. at 21 n. 7, *Washington Post* (No. 81–535). Recognizing the potentially personal quality of non-lexical information would no more render the threshold meaningless, therefore, than does the *Washington Post* decision itself: the financial records of a large corporation, which the Supreme Court instanced, still do not pass the threshold because they do not contain information "personal to any particular individual."

B. The Author/Subject Fallacy

■ Notwithstanding the Supreme Court's reference to "any particular individual," the dissenters' new conceit is that "in order to be a 'similar file,' a file must contain *personal information about the subject (not just the author or maker) of that file.*" Dis. op. at 1016–17. This restriction on the scope of Exemption 6 does not even pretend to any legislative parentage.[3] And it casually ignores binding precedent that establishes the scope of Exemption 6: in *Washington Post*, the Supreme Court instructed us to look not to "the nature of the file[ ] in which the information [is] contained," 456 U.S. at 599, 102 S.Ct. at 1960, but solely to whether the information in the file "applies to a particular individual," *id.* at 602, 102 S.Ct. at 1961–62. An author may be a "particular individual," and as such may have a privacy interest cognizable under Exemption 6.

A second difficulty with the dissent's distinction between the subject and the author of a file is that it implicitly, and erroneously, presupposes that every file has an inherent and discoverable "subject." Such an assumption would invite every FOIA plaintiff, and the district courts to which they repair, to describe the subject of disputed files opportunistically in order to bolster the case for disclosure.

In this case, for example, whether the astronauts are a subject of the Challenger tape depends upon the information that one seeks to extract from that tape. The dis-

---

**3.** The dissent's complete departure from any statutory mooring can be seen in its apparent rejection, at the threshold, of a claim of authorial privacy with respect to medical files. Under the dissent's approach, a medical file would not be a personnel, medical, or similar file if the privacy interest asserted was that of the doctor or nurse who had authored it. *See* dis. op. at 1016.

senters say that the *"subject* [of the file], for Exemption 6 purposes, would be the operation of the shuttle." Dis. op. at 1017. That is no doubt one fair statement of the subject of the *transcript* (or of some of it, perhaps not including such lines as "Feel that mother go," or the final entry, "Uh-oh"). But it is mechanistic in the extreme to insist that it is also the *only* fair statement of the subject of the *tape*, which adds to the transcript the astronauts' voice inflections. Yet insist the dissent does—as though the world were neatly divided and labeled according to the rules of English usage. And as though it were not clear—for it is undisputed—that NASA's "interest in retrieving [from the ocean floor] the voice and data recorded on that tape was to determine what the crew was aware of during the flight," Moorehead Decl., Jan. 27, 1987, Ex. 1, Defendant's Motion for Summary Judgment, *New York Times Co. v. NASA,* 679 F.Supp. 33 (D.D.C.1987), and not, as the dissent would have it, to assess "the operation of the shuttle."

The suggestion that, in "some borderline cases," a court must make a "context-specific inquiry to determine what or who is the subject of a file," dis. op. at 1014 n. 4, fails to recognize that the relevant context is a function of the purpose of the inquiry. Divorced from the statutory purpose of identifying "information which applies to a particular individual," a "context-specific inquiry" is an experiment without a hypothesis, a useless thing, yielding only arbitrary or incoherent results.

Suppose that "the purpose for which an agency created and maintains" a file is the study of voice inflections, or research into computerized voice recognition. In a file of audio tapes classified by type of voice inflection, this one might be under the heading "mortal fear." In a file created in the course of voice recognition research, it might be found under the name of the person whose voice it is. Obviously, there is no unique subject inherent in the text of the file. One could equally well say of the Challenger tape—depending upon the filing system in which the agency "maintains" it—that the subject is an air disaster, last words, astronauts, voices of famous people,

or, as the dissent classifies it, "the operation of the shuttle," dis. op. at 1017. The logic of the dissent offers no criterion by which we, or a subsequent court, could be guided in the bootless search for "the subject" of a file; one could stop arbitrarily at any point and announce a result, as one likes.

This is amply illustrated by the dissent itself, which attempts to distinguish the case of the Apollo 1 tape, dis. op. at 1018, by suggesting that over the course of a few seconds the authors of that tape were somehow "transformed" into its "subjects." Why is there no similar metamorphosis in the crew of the Challenger? Even the Times acknowledged what the dissenters would now deny, *viz.* that it is "the question of how long the astronauts in the capsule survived ... to which this tape directly relates." Transcript of Hearing on Cross Motions for Summary Judgment, May 14, 1987, at 33, *New York Times Co. v. NASA,* 679 F.Supp. 33 (D.D.C.1987). No explanation is, or could be, provided because the approach taken by the dissent offers no criterion of judgment.

As for incoherent results, suppose next that someone doing research for a biography of Commander Scobee seeks disclosure under the FOIA of "all cockpit and other voice recordings of Commander Scobee," or of a (hypothetical) NASA file, "Oral Statements of Commander Scobee," containing every voice recording he ever made in the course of his work for the agency. By the dissenters' approach, the subject of each individual tape might well be something like "the operation of the shuttle." Yet it is inconceivable that the subject of the file of collected tapes would not be the person whose voice is their unifying theme, *viz.* Commander Scobee. Disclosure would thus depend upon whether the tapes are scattered among files relating to different missions, as opposed to being collected in the single file instanced above.

▪ These "context-specific" searches for the "subject" of each file sought under the FOIA and withheld under Exemption 6 are neither useful nor necessary. An in-

quiry into the reason a file was created, or the manner in which it is maintained, does not appear to be any different from an inquiry into the label on the file, which the Supreme Court emphatically rejected in *Washington Post.* Under that case, our concern must be solely with whether the information "applies to a particular individual," not with "the nature of the file[ ] in which the information [is] contained." 456 U.S. at 599, 102 S.Ct. at 1960.

Finally, there is no warrant for the dissenters' fear that we are abandoning the norm of narrow construction applicable to exemptions under the FOIA. The operation of Exemption 6 will be limited in the manner the Congress and the Supreme Court expected it to be limited: at the balancing stage. It is the rare file indeed for which the Government could, in good faith, assert an interest in authorial privacy, simply because it is most unusual for a government file to yield up any meaningful information about its author.[4] (In fact, research reveals no case in which the Government has ever before even asserted the privacy interest of the author of a file.) Even more rarely, of course, will the author's interest outweigh the public interest in disclosure of the government file that he or she authored.

For precisely that reason, all but the most unusual assertion of authorial privacy would easily be disposed of under the categorical approach to Exemption 6 claims, without any need to resort to ad hoc balancing. *See National Ass'n of Retired Fed. Employees,* 879 F.2d 873, 879 (D.C. Cir.1989), *quoting Department of Justice v. Reporters Committee for Freedom of the Press,* 489 U.S. 749, 109 S.Ct. 1468, 1483, 103 L.Ed.2d 774 (1989) ("categorical decisions may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction"). Thus, a claim to exemption from disclosure based upon a fear that the author's "syntactic felicity," or lack thereof, would reveal "information about the depth and breadth of his or her education," dis. op. at 1015, or upon a fear that the taped voice inflections of a person delivering a speech would reveal that person's emotional state, would involve such trivial privacy interests that the claim simply could not rise to the level of "a *clearly* unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Hence, the objection made by the dissenters is as unwarranted as their own highly imaginative approach is unworkable.

Numerous government files may contain the type of non-lexical information we have identified as meeting the similar files requirement, but that cannot justify our raising the Exemption 6 threshold above the level set by the Supreme Court. If the information "applies to an individual," then it might harm that individual; for that reason it crosses the threshold, and the privacy interest of the person to whom it applies must be considered and balanced against the public interest in releasing it.

### III. CONCLUSION

■ Whether disclosure of the Challenger tape in this case would constitute a clearly unwarranted invasion of privacy, we do not know and cannot discern on the record before us. The families of the astronauts attempted to explain *in camera* the basis for their privacy claims, but the district court rejected their affidavits because it truncated at the threshold its analysis of the Exemption 6 claim.

We hold that the voices of the astronauts, and whatever those voices may re-

---

4. To be sure, many critical analyses by "[l]inguists, literary theorists, philosophers, legal theorists, and other scholars" may support Oscar Wilde's conclusion that "every portrait that is painted with feeling" reveals more of the painter than of his subject. *See* dis. op. at 1015 & n. 6. If government files were works of art, such observations might be relevant to them as well. But they are not; and anyone who has had to read a significant number of government files cannot seriously apply to them the teachings of literary criticism.

A government audio or video tape is no more a work of art than is the written text in a government file. Although a recording captures more information about a speaker than does a transcript of the speaker's words, the added information could rarely implicate the speaker's privacy—presumably not at all where the taped event was itself public.

veal of their thoughts and feelings at the very moment of their deaths, constitute "information which applies to ... particular individual[s]." Therefore, we remand this case for the district court to determine whether any invasion of the astronauts' (or their families') privacy that the disclosure of the Challenger tape would cause is or is not "clearly unwarranted" when compared to the "citizens' right to be informed about what their government is up to." *Reporters Committee*, 109 S.Ct. at 1481.

HARRY T. EDWARDS, Circuit Judge, with whom WALD, Chief Judge, MIKVA and RUTH BADER GINSBURG, Circuit Judges, and SPOTTSWOOD W. ROBINSON, Jr., Senior Circuit Judge, join, dissenting:

This is an action brought by appellee, the New York Times Company (the "Times"), against appellant, the National Aeronautics and Space Administration ("NASA" or "agency"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1988), to compel the disclosure of a voice recording of the crew of the space shuttle Challenger. The agency already has released a transcript of the tape of the astronauts' communications during the ill-fated Challenger flight. NASA claims, however, that the tape of the voice recording is covered by "Exemption 6" of FOIA, which provides that the statute's disclosure requirements do not apply to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (1988).

NASA's claim before this court is somewhat astonishing in light of its concession before the District Court that

> [t]he words spoken on the withheld tape are the observations and communications of certain of the Challenger astronauts *concerning the launching of the space shuttle.* The withheld tape *contains no information about the personal lives of the Challenger astronauts or any of their family members.*

Given this concession and the other undisputed evidence before it, the District Court granted summary judgment for appellee. The trial court rejected NASA's contention that the tape was a "similar file" under Exemption 6, and ruled that the material sought was subject to disclosure under FOIA. *See New York Times Co. v. NASA,* 679 F.Supp. 33, 36 (D.D.C.1987). A divided panel of this court affirmed the judgment of the trial court. *See New York Times Co. v. NASA,* 852 F.2d 602 (D.C.Cir.1988). NASA then filed a suggestion for *en banc* consideration, and the court decided to rehear the case.

A majority of the court now reverses the District Court. The majority's opinion starts with the unremarkable, indeed indisputable, proposition that voice inflections and other "non-lexical" information *can* constitute personal information sufficient to satisfy Exemption 6's "similar files" threshold. It then points out that the tape at issue in this case contains voice inflections and from there leaps to the conclusion that the tape therefore satisfies the Exemption 6 threshold. Noticeably missing from the majority's analysis is that step in which the court should have inquired whether the "non-lexical" information on this tape *actually does* constitute genuinely personal information.

There is, of course, a reason for this hole in the majority's analysis: on the record before us NASA has disavowed that the tape contains genuinely personal information. The majority recognizes that "the taped words do not contain information about the personal lives of the astronauts," but NASA itself went even further in conceding that *"[t]he withheld tape* contains no information about the personal lives of the Challenger astronauts." This concession, which must be read to encompass both the "lexical" and "non-lexical" information on the tape, renders indefensible the majority's holding.

We would hold that, on the record in this case, Exemption 6 has no application. The District Court properly concluded that, because the voice recording was not a "similar file," the Government had failed to satisfy the threshold test of Exemption 6. The majority now holds that if an identifia-

ble individual is somehow connected with a Government file, that file automatically becomes a "similar file" under Exemption 6. That is not what the statute says. To be a "similar file" under Exemption 6, a file must be a "detailed Government record[ ] on an individual which can be identified as applying to that individual," *Department of State v. Washington Post Co.*, 456 U.S. 595, 602, 102 S.Ct. 1957, 1961, 72 L.Ed.2d 358 (1982), and it must contain personal information about the *subject* of the file. There is no such information at issue in this case, for NASA has conceded that "the withheld tape contains no information about the personal lives of the Challenger astronauts or any of their family members." Furthermore, contrary to NASA's arguments in this case, we believe that information that one might infer about the author or maker of a file is not the kind of information that qualifies for protection under Exemption 6.

The result reached today defies the will of Congress as expressed in the statute. We dissent because we believe that we are constrained to enforce the statute as it was written by Congress.

## I. BACKGROUND

The file over which this litigation ensued was created on January 28, 1986, during the flight of the Challenger space shuttle. The collection and recording of a wide variety of data concerning the operation of the shuttle prior to liftoff and during its flight was an important, albeit routine, part of the shuttle mission. In order to facilitate the data collection and recording function, the shuttle was equipped with three digital tape recorders, and the astronauts' helmets were equipped with voice-activated micro-phones which fed into the tape recorders. Prior to liftoff, and during the flight, the crew members performed their information-gathering tasks by making a taped report of their observations of gauge readings, altitude, velocity, and other similar matters.[1] That data-gathering tape is the "file" at issue in this case.

After a flight lasting only seventy-three seconds, the Challenger exploded, killing all of the crew members. Post-flight media coverage of the tragic accident was extensive and prolonged. On July 18, 1986, in an effort to probe the details of the accident, the Times filed a FOIA request with NASA seeking the "transcripts of all voice and data communications recorded aboard the space shuttle Challenger," including "all conversations involving crew members through the shuttle's intercom system," as well as "copies of the voice communications tapes, which may include the background noises or voice inflections not reflected in the transcripts." *See* Letter from David E. Sanger to Shirley Green (July 18, 1986), *reprinted in* J.A. 9. On August 1, 1986, NASA released to the Times a transcript of the tape.[2] *See* Letter from Lillian R. Levy to David Sanger (Aug. 1, 1986), *reprinted in* J.A. 10. However, relying solely on Exemption 6, the agency refused to release a copy of the tape itself, asserting that "the privacy of the families of the astronauts would be invaded significantly by its release because it would subject them to hearing the voices of their loved ones, an intrusion on their grief which certainly would exacerbate feelings of hurt and loss." *See id.* The Times filed an administrative appeal of the agency's denial of its request for "copies of the voice communications tapes," *see* Letter from David E. San-

---

1. *See Transcript of The Challenger Crew Comments From the Operational Recorder*, Exhibit C to Affidavit of David E. Sanger, Plaintiff's Motion for Summary Judgment, *New York Times Co. v. NASA*, 679 F.Supp. 33 (D.D.C.1987) (Civ. No. 86–2860) ("*Challenger Transcript*"), *reprinted in* Joint Appendix ("J.A.") 39–43.

2. Among the Challenger's three digital tape recorders, the "OPS 2" system was the one that recorded the voices of the crew members. Their taped report covered the span of time from eight minutes and twenty-five seconds pri-

or to launch to seventy-three seconds after launch—when the shuttle self-destructed. The tape was immersed in salt water for 43 days before NASA recovered it. NASA was able to restore the tape to make a usable, albeit somewhat damaged, copy, which the agency then transcribed. The transcribed portion of the tape covers the period from two minutes and five seconds prior to launch up through seventy-three seconds after launch. *See Challenger Transcript, reprinted in* J.A. 39–43.

ger to James C. Fletcher (Aug. 11, 1986), *reprinted in* J.A. 12–13; this appeal was also rejected by NASA on the ground that the information sought was protected from disclosure under Exemption 6. *See* Letter from Ann Bradley to David E. Sanger (Sept. 30, 1986), *reprinted in* J.A. 14–18.

The Times then sued NASA in the District Court for release of a copy of the tape. Reasoning that the tape contained no "personal information" about the astronauts or their family members, and that the tape was therefore not a "similar file" for purposes of Exemption 6, the District Judge concluded that "the tape does not satisfy the threshold requirement for protection under Exemption 6 and must, therefore, be released under the disclosure requirements of the FOIA." *New York Times Co. v. NASA*, 679 F.Supp. 33, 36 (D.D.C.1987) (footnote omitted). Because it disposed of NASA's exemption claim on this ground, the trial court found it unnecessary to consider whether release of the tape would constitute a "clearly unwarranted invasion of personal privacy" under the second step of Exemption 6 analysis. *See id.* at 36 n. 6.

On appeal, a panel of this court affirmed the judgment of the District Court, also concluding that the tape did not pass the "personnel, medical, or similar files" threshold test, and that, therefore, FOIA required the agency to release it. *See New York Times Co. v. NASA*, 852 F.2d 602 (D.C.Cir.1988). NASA filed a suggestion for *en banc* consideration, and this court decided to rehear the case. *See* 860 F.2d 1093 (D.C.Cir.1988). The majority now reverses, holding that if an identifiable individual is somehow connected with a Government file, that file automatically becomes a "similar file" under Exemption 6. Because this holding is flatly at odds with what Congress has said in Exemption 6, we dissent.

## II. ANALYSIS

### A. *Introduction*

The Freedom of Information Act establishes that Government records are open to public disclosure, subject to nine "exclu-sive" and "narrowly construed" exemptions. *See Department of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976). In particular,

> § 552(a)(3) requires every agency "upon any request for records which ... reasonably describes such records" to make such records "promptly available to any person." If an agency improperly withholds any documents, the district court has jurisdiction to order their production. Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden "on the agency to sustain its action" and directs the district courts to "determine the matter de novo."

*Department of Justice v. Reporters Committee*, 489 U.S. 749, 109 S.Ct. 1468, 1472, 103 L.Ed.2d 774 (1989) (footnotes omitted). In this case, NASA relies solely on Exemption 6 in opposing the request from the Times for disclosure of the voice recording.

As noted above, Exemption 6 provides that FOIA's disclosure requirements do not apply to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (1988). Under this provision, the threshold question is whether the information sought is contained in a personnel, medical or similar file. If it is not, then the information is not entitled to Exemption 6 protection. If, however, the information is contained in such a file, then the court must assess whether release of the information would constitute a "clearly unwarranted invasion of personal privacy." *See Department of State v. Washington Post Co.*, 456 U.S. 595, 602 & n. 4, 102 S.Ct. 1957, 1962, 72 L.Ed.2d 358 (1982). In this case, the agency does not contend that the tape at issue is a "personnel" or "medical" file, so our threshold analysis is confined to the question whether the tape is a file that is "similar" to either of those types of file.

Arguing that the information-gathering tape at issue in this case is a "similar file," NASA states that "the sound of an individual's voice is essentially unique to that

person," Brief for Appellant at 24, and that, "[a]part from the uniqueness of an individual's voice, it may convey information independent of and in addition to the particular words spoken by the individual," *id.* at 25. The agency thus contends that "the tape *does* contain information personal to the [Challenger crew members]—the sound and inflection of their voices." *Id.* (footnote omitted).

At oral argument, the agency pressed its argument to the logical conclusion that, even when a file contains information that is otherwise fully disclosable under FOIA, a file passes the "similar file" threshold test simply because of the personal information one might infer about the author or maker of the file. In other words, NASA urges this court to accept the proposition that an information-gathering file made by a government employee in the course of his official duties passes the Exemption 6 threshold solely because someone might be able to draw inferences about the maker of the file. This proposition plainly rests on an untenable reading of FOIA.

B. *The Meaning of "Similar Files" Under Exemption 6*

In construing the statutory term "similar files," we look, as did the District Court, to the Supreme Court's landmark decision in *Department of State v. Washington Post*, 456 U.S. 595, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982). Prior to the Court's decision in *Washington Post*, this circuit had interpreted the phrase "similar files" to embrace only those agency files in which the "personal quality" of the information sought is "as highly personal or as intimate in nature" as that found in personnel or medical files. *See Board of Trade of the City of Chicago v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 398 (D.C. Cir.1980); *see also Simpson v. Vance*, 648 F.2d 10, 13 (D.C.Cir.1980); *Washington Post Co. v. Department of State*, 647 F.2d 197, 198–99 (D.C.Cir.1981), *rev'd*, 456 U.S. 595, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982). In *Washington Post*, the Supreme Court rejected this interpretation of "similar files," holding that passport records of two Iranian nationals living in Iran were "sim-

ilar files" for the purposes of Exemption 6. *See* 456 U.S. at 602–03, 102 S.Ct. at 1961–62.

The Court in *Washington Post* acknowledged that the language of Exemption 6 itself "sheds little light on what Congress meant by 'similar files.'" *Id.* at 599, 102 S.Ct. at 1960. Therefore, in articulating an interpretive principle for the phrase "similar files," the Court relied heavily on FOIA's legislative history. "The House and Senate reports," stated the Court, "suggest that Congress' primary purpose in enacting Exemption 6 was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *Id.* On the basis of this and other parts of FOIA's legislative history, as well as *Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), the Court concluded that Congress did not intend to

> limit Exemption 6 to a narrow class of files containing only a discrete kind of personal information. Rather, "[t]he exemption [was] intended to cover detailed Government records on an individual which can be identified as applying to that individual. . . ." When disclosure of information which applies to a particular individual is sought from Government records, courts must determine whether release of the information would constitute a clearly unwarranted invasion of that person's privacy.

456 U.S. at 602, 102 S.Ct. at 1961–62 (citations and footnotes omitted). In reaching this conclusion, however, the Court emphasized that it did *not* intend to

> render meaningless the threshold requirement that information be contained in personnel, medical, and similar files by reducing it to a test which fails to screen out any information that will not be screened out by the balancing of private against public interests. As petitioners point out, there are undoubtedly many Government files which contain information not personal to any particular individual, the disclosure of which would nonetheless cause embarrassment to cer-

tain persons. Information unrelated to any particular person presumably would not satisfy the threshold test.

*Id.* at 602 n. 4, 102 S.Ct. at 1962 n. 4.

Thus, the Court's interpretive principle for "similar files" emerges from several passages in the *Washington Post* opinion: a record is a similar file when it is a "record on an individual which can be identified as applying to that individual," *see id.* at 602, 102 S.Ct. at 1961, or when it contains information whose disclosure "applies to" or is "personal to" or "relates to" a "particular individual," *see id.* at 602 & n. 4, 102 S.Ct. at 1962 & n. 4.

In pressing its opposition to disclosure of the voice recording at issue in this case, NASA relies heavily on its view that, under *Washington Post, "any* government file which contains information applying to individuals is a 'similar file.' " Reply Brief for Appellant at 6 (emphasis in original); *see also* Brief for Appellant at 22; Substituted Supplemental Brief for Appellant at 8. Thus, the agency argues that the information from voice inflections that one might infer about the astronauts who created the disputed information-gathering file is "personal" to them, and so passes

the Exemption 6 "similar files" threshold test. This argument, however, which also lies at the core of the majority's analysis, misapprehends the Court's Exemption 6 test, in that NASA's reading is insufficiently attentive to *which* individual it is whose "personal information" Exemption 6 seeks to protect.[3]

Every Government file that might become the subject of a FOIA request has two analytically distinct attributes. One is that it is *made* or *authored* by some person or group of persons. Another is that it has a *subject*, which may or may not be a person. Examples of *authors* of files might include an auditor who prepares an institution's financial report, a supervisor who grades an employee's job performance, or a doctor who writes a medical report on a person. For each example of an author of a file there is a corresponding example of the *subject* of the file: the institution about which the financial report was written, and the employee about whom information is gathered in the evaluation or medical file. Of course, it is possible for the author and the subject of a given file to be the same, but they are always analytically distinct for purposes of applying Exemption 6.[4]

**3.** There is no doubt that a file must contain "personal" information to be a "similar file" under Exemption 6. *See Washington Post,* 456 U.S. at 599, 102 S.Ct. at 1960 (Congress intended Exemption 6 to "protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of *personal information"*) (emphasis added); *id.* at 599–600, 102 S.Ct. at 1960–1961 (Congress' " 'primary concern' " in drafting Exemption 6 was to " 'provide for the confidentiality of *personal matters.' "*) (quoting *Department of the Air Force v. Rose,* 425 U.S. 352, 375 n. 14, 96 S.Ct. 1592, 1606 n. 14, 48 L.Ed.2d 11 (1976)) (emphasis added). In *Washington Post,* the Court did not stray from its conclusion in *Rose* that, in order to be a "similar file," a file must contain personal information. Rather, adhering to that view, the Court expanded the scope of the *type* of "personal information" that qualified for "similar file" status, rejecting this court's narrower conception according to which the information had to be *"highly* personal or *intimate* in nature."

**4.** There undoubtedly will be some borderline cases in which it may be difficult to discern the subject of a file for Exemption 6 purposes—the possibility of vagueness, of course, attends every empirical concept. However, in any such case,

a court is capable of making a context-specific inquiry to determine what or who is the subject of a file, taking into account such factors as the purpose for which an agency created and maintains the file and the understanding of the person who is possibly its subject.

In all cases the court's assessment would turn upon the information actually contained within the file, *i.e.,* whether the file contained information "which applies to a particular individual" such that that individual is a subject of the file. Contrary to the majority's suggestion, posturing by the parties, such as how "opportunistically" they characterize the subject of a file, or what sort of information they *hope* might be extracted from it, would obviously be quite beside the point of the court's central inquiry: whether the file actually contains personal information about a particular individual. In this case, for example, the court's assessment would be controlled by NASA's concession that the tape contained no personal information about the astronauts. That the Times was unwilling to accept NASA's characterization at face value, and instead desired to judge the tape for itself, does not mean, as the majority seems to believe, that the tape *must* contain personal information after all; the Times, of course, has not heard the

The language and legislative history of Exemption 6 make clear, as do *Washington Post* and its progeny, that the "personal information" that Exemption 6's "similar files" test protects *cannot be information about the author or maker of the file unless she or he is also the subject of the file*. To read Exemption 6, as the majority does, to protect "personal information" about the author or maker of a file who is not also the subject "render[s] meaningless" the "similar files" threshold test, for *every file* created by a person yields some personal information about its author or maker. For example, a typewritten report or letter reveals a good deal of personal information about its author, including information about the depth and breadth of his or her education (as reflected in such elements as word choice, syntactic felicity, mastery of subject matter), editorial care, argumentative facility, organizational skill, and so on.[5]

Linguists, literary theorists, philosophers, legal theorists, and other scholars have devoted substantial attention to the study of the kinds of information that writing or speaking reveals about an author apart from the explicit message in the writing or speech. *See, e.g.*, R. LANHAM, STYLE: AN ANTI-TEXTBOOK 21–32 (1974) (discussing examples of writing by students, faculty members, and administrators); R. POSNER, LAW AND LITERATURE: A MISUNDERSTOOD RELATION 283–84 (1988) (discussing examples of writing by judges).[6] Some scholars, following Aristotle and other ancient writers, refer to this information as the "character" ("*ethos*") of the author. *See* C. PERELMAN & L. OLBRECHTS-TYTECA, THE NEW RHETORIC: A TREATISE ON ARGUMENTATION § 72 at 319 (1969) ("[A] speech determines the opinion one will form of the [speaker]. What the ancients used to call *oratorical ethos* can be summed up as the impression which the speaker, by means of his words, gives of himself."); R. LANHAM, *supra* at 24–25; R. POSNER, *supra* at 276; W. DEVRIES, ETHOPOIIA: A RHETORICAL STUDY OF THE TYPES OF CHARACTER IN THE ORATIONS OF LYSIAS (1892) (discussing how such elements of speeches before ancient Athenian courts as word selection and syntax gave audience impression that speaker was "humble or inexperienced speaker," or revealed other aspects of his character). Everyday life provides countless examples in which readers and hearers infer this kind of character information—"personal" information—about authors (both writers and speakers). *See, e.g.*, R. MITCHELL, LESS THAN WORDS CAN SAY 61–62 (1979) (quoting letter to newspaper and discussing inferences one is likely to draw from it about its author). Indeed, a judge learns to discern character information from a brief or oral argument even when the advocate is hitherto unknown to him or her.

In accepting NASA's argument that information one can infer about the author or maker of a file who is not also the subject of that file is "personal" information sufficient to pass the threshold of Exemption 6,

---

tape and its speculations are therefore irrelevant.

5. The "file" at issue in this case is a tape recording, and is in relevant respects no different from a written report or letter. NASA extends its argument, however, even to files containing a collection of papers, forms, etc. For example, NASA argues that the presence on a file of a fingerprint of its maker (*i.e.*, its compiler, or even the person who copies the file to satisfy the FOIA request)—which is no less "essentially unique to a person" than is the voice, *see* Brief for Appellant at 24—would convert it into a "similar file." *See* Appellant's Petition for Rehearing with Suggestion for Rehearing *En Banc*, at 13–14, *New York Times Co. v. NASA* (D.C.Cir.) (No. 87–5244). Moreover, even apart from the fingerprints of a file's maker, virtually all files contain some kind of narrative reports about the subject of the file from which one may infer character information about the authors of those reports. Both examples illustrate the way in which NASA's reading of "similar files," adopted by the court today, eviscerates the threshold test in just the way that the statute and *Washington Post* both clearly forbid.

6. As one might expect, this basic observation has not escaped the notice of artists. *See, e.g.*, O. WILDE, *The Picture of Dorian Gray*, in THE COMPLETE WORKS OF OSCAR WILDE 379 (1963) (character in novel, a painter, asserting that "every portrait that is painted with feeling is a portrait of the artist, not of the sitter. The sitter is merely the accident, the occasion. It is not he who is revealed by the painter; it is rather the painter who, on the coloured canvas, reveals himself.").

the majority effectively holds that *no* file would *not* be a "similar file," because *every* file made by persons can yield such information. This reading, for all intents and purposes, "render[s] meaningless" the "similar files" threshold test clearly expressed in the statute, a result which the Supreme Court has expressly rejected. *See Washington Post*, 456 U.S. at 602 n. 4, 102 S.Ct. at 1962 n. 4.[7]

The legislative design of Exemption 6 also makes clear that the personal information intended to be protected is only information about the subject of the file. We know of no case—and NASA cites none—in which a "similar file" under Exemption 6 has been construed to cover personal information pertaining to the author or maker of the file.[8] This is hardly surprising, because personal information in "personnel" and "medical" files under Exemption 6 always has been construed to mean the subject, not the author, of the file. When personnel files have been at issue, the information at issue is always about the employee with respect to whom information has been written or collected, and not about the author or maker of the file. *See, e.g., National Ass'n of Retired Federal Employees v. Horner*, 879 F.2d 873, 874 (D.C.Cir.1989) (applying Exemption 6 to re-

quest for information about federal employees listed in annuity rolls), *cert. denied sub nom. National Ass'n of Retired Federal Employees v. Newman*, —— U.S. ——, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990). Likewise, when a medical file is at issue, it has never been the doctor or nurse who wrote the reports constituting that file whose privacy is potentially protected, but always the subject of the medical examination. *See, e.g., Badhwar v. Department of the Air Force*, 829 F.2d 182, 185–86 (D.C. Cir.1987) (considering Exemption 6 claim for withholding of autopsy report); *cf. Arieff v. Department of the Navy*, 712 F.2d 1462 (D.C.Cir.1983) (applying Exemption 6 to request for medical information). In *Washington Post* the Court made clear that the terms "personnel" and "medical" were to be used as "benchmarks for measuring the term 'similar files.'" *See* 456 U.S. at 600, 102 S.Ct. at 1961. Adhering to that useful principle of construction, we note that one apparently universally presupposed characteristic of these two statutory benchmarks—"personnel" and "medical"—is that they apply only to subjects, and not to authors, of files.

In short, under *Washington Post*, in order to be a "similar file," a file must con-

---

**7.** The majority suggests only two categories of files that would *not* pass Exemption 6's "similar files" test: those authored anonymously and those authored by so many persons that the files' non-lexical information could not be traced to a single identifiable author. But this only points out the absurdity of the majority's position. That a given file's "similarity" to personnel or medical files should turn on whether it was written anonymously or by more than one person mocks Congress' intentions in drafting the exemption. It is one thing to hold, as the Supreme Court did in *Washington Post*, that a passport file is "similar" to a personnel or medical file even though the personal information it conveys is not "intimate." It is entirely another to hold, as the majority implicitly does today, that a Government report, even of the most mundane and impersonal nature, is "similar" to an individual's personnel or medical file whenever it is authored by an identifiable Government bureaucrat.

**8.** In *Department of Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), one of the Supreme Court's early landmark opinions on Exemption 6, the information at issue per-

tained to the *subjects* of disciplinary investigations. *See id.* at 376–77, 96 S.Ct. at 1606–07. It was never even suggested that Exemption 6 might cover personal information pertaining to the investigators, *i.e.*, the makers of the files. *See also Carter v. Department of Commerce*, 830 F.2d 388, 391 (D.C.Cir.1987) (portions of disciplinary investigation files withheld under Exemption 6 because disclosure would "identify the *subjects* of the investigations themselves") (emphasis added).

NASA illustrates just this point by offering a hypothetical example of a mine safety report that includes the following statement: "Inspector Jones conducted the inspection because Inspector Doe was in divorce court fighting for permanent custody of his daughter, Mary." *See* Substituted Supplemental Brief for Appellant at 15 n. 6. We agree with the agency's suggestion, *see id.*, that *Inspector Doe's* privacy concerns might be important in an Exemption 6 analysis of such a case; this is because, in this hypothetical, Doe has become one of the *subjects* of the file. Inspector Jones, however, would be the *author* of the file, and not even the agency suggests that Exemption 6 would protect information that might be inferred about him.

tain *personal information about the subject (not just the author or maker) of that file.* This reading of Exemption 6 is faithful to the language of the statute, its design, its intent as revealed in its legislative history—including the powerful broad norm of disclosure that, as the Supreme Court and this court have often noted, animates the whole of FOIA, including its exemptions [9]—and to the Supreme Court's analysis in *Washington Post.*

#### C. *Application of Exemption 6 to the Facts of this Case*

The file at issue in this case is an audio tape made by the Challenger crew members as part of their routine, official information-gathering duties. Pursuant to these duties, the crew members collected and recorded information about the technical operation of the shuttle, as revealed, to a large extent, by gauges and other instruments. *See Challenger Transcript, reprinted in* J.A. 39–43.

It is probably precisely the routine and businesslike subject matter of this file that led NASA to release a transcript of the tape without hesitation after the Times' initial FOIA request. Indeed, the routine, non-personal nature of the information probably explains NASA's concession before the District Court that

> [t]he words spoken on the withheld tape are the observations and communications of certain of the Challenger astronauts *concerning the launching of the space shuttle.* The withheld tape *contains no information about the personal lives of the Challenger astronauts or any of their family members.*

*See* Defendant's Statement of Genuine Issues, *New York Times Co. v. NASA,* 679 F.Supp. 33 (D.D.C.1987) (Civ. No. 86–2860), *reprinted in* J.A. 100 (citing Plaintiff's Motion for Summary Judgment, *New York Times Co. v. NASA,* 679 F.Supp. 33 (D.D.C. 1987) ¶ 6, *reprinted in* J.A. 26–27 (emphasis added)). The majority objects to the characterization of this statement as a "concession" by NASA, but it is absolutely clear that we must accept the substance of this statement as established fact. *See* U.S.Dist.Ct.Loc.R. 108(h) ("In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."). The majority is unjustified, therefore, in suggesting that this "concession" is somehow not properly attributed to NASA.

The file at issue in this case is, as it were, an audio snapshot—not of the astronauts, but of the interior of the cockpit as witnessed by technically trained observers. Certainly a schooled eye might infer from this "snapshot" some "character" information about the skill and training—perhaps even the stylistic judgment or preferences—of the person making it; nevertheless, its *subject,* for Exemption 6 purposes, would be the operation of the shuttle, not the cameraperson him or herself.

---

**9.** FOIA's legislative history makes quite clear Congress' intent to authorize broad disclosure under the statute, as well as its design to give a narrow scope to the nine exemptions from FOIA's mandatory disclosure requirements. *See, e.g.,* S.Rep. No. 813, 89th Cong., 1st Sess. 3 (1965) (FOIA establishes a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language."); H.R.Rep. No. 1419, 92d Cong., 2d Sess. 7 (1972) (when in doubt, agency "supposed to lean toward disclosure, not withholding"); S.Rep. No. 854, 93d Cong., 2d Sess. 6 (1974), U.S.Code Cong. & Admin.News 1974, 6267, 6271 (exemptions to FOIA "mark the outer limits of information that may be withheld") (emphasis removed). Following this clear legislative guidance, the Supreme Court has consistently observed that "[t]he Freedom of Information Act

sets forth a policy of broad disclosure of Government documents in order 'to ensure an informed citizenry, vital to the functioning of a democratic society.'" *FBI v. Abramson,* 456 U.S. 615, 621, 102 S.Ct. 2054, 2059, 72 L.Ed.2d 376 (1982) (quoting *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978)) (citing *EPA v. Mink,* 410 U.S. 73, 80, 93 S.Ct. 827, 832–33, 35 L.Ed.2d 119 (1973)). Thus, we do not view the Court's reference in *Washington Post* to the "broad meaning" Congress intended to give "similar files," *see* 456 U.S. at 600, 102 S.Ct. at 1960–61, to be at odds with its "consistent statement" that "FOIA exemptions are to be narrowly construed," *see Department of Justice v. Julian,* 486 U.S. 1, 8, 108 S.Ct. 1606, 1611, 100 L.Ed.2d 1 (1988) (citations omitted).

The only information that NASA seeks to withhold is "character" information about the makers of the file, namely, the astronauts. For reasons offered above, to allow such information to constitute the type of "personal information" Congress designed Exemption 6 to protect is to render meaningless the threshold test of "similar files." This result does violence to the language and legislative history of Exemption 6, a result that the Supreme Court has consistently rejected.

It is telling that the majority, in order to make the point that voice inflections can convey personal information, must resort to a case not before us, the 1967 fire aboard the Apollo 1 spacecraft, in which voice inflections certainly revealed genuinely, even profoundly, personal information. That, of course, is a very different case, one in which the tragic course of events—a fire occurring over several minutes—transformed the astronauts into the tape's subjects as well as its authors. Here, however, as NASA has conceded, the very suddenness of the tragedy precluded the Challenger tape from assuming that character. Thus, on the record before us, we cannot subscribe to the majority's holding that the tape the Times seeks is a "similar file" within the meaning of Exemption 6.

### III. CONCLUSION

At bottom, the majority reads Exemption 6 as a general exemption for any information whose privacy value outweighs its public value. Perhaps such a view reflects a better public policy, but it is not the view that Congress embraced in enacting Ex-

emption 6.[10] The majority claims to give some meaning to the threshold test of Exemption 6, but none is forthcoming. The majority looks solely to the *effect* of the release of information, thus looking past the "similar files" threshold. The result is that the majority adopts precisely the sort of approach disavowed by the Supreme Court in *Washington Post*—"render[ing] meaningless the threshold requirement . . . by reducing it to a test which fails to screen out any information that will not be screened out by the balancing of private against public interests." 456 U.S. at 602 n. 4, 102 S.Ct. at 1962 n. 4.

The majority essentially discards from Exemption 6 as surplusage the words "personnel and medical files and similar." This is a perplexing result, especially given that this court has no legislative authority to modify a congressional enactment. We understand the Supreme Court to have circumscribed the meaning of those qualifying (threshold test) words, but we do not read *Washington Post* effectively to have deleted the six words from the statute altogether. Unless and until the Supreme Court tells us the words Congress employed signify nothing, we must give them content. Therefore, we dissent.

---

**10.** There is a hint in the majority's recounting of the facts that the Times' interest in obtaining the Challenger voice recording is sensational or voyeuristic. Even accepting that proposition, however, we are not at liberty to rewrite FOIA to defeat an unseemly request. That the appellee's purpose might be voyeuristic, and that its arguably morbid quest would indeed impinge upon the privacy and enhance the grief of the astronauts' families does not authorize the court to expand upon the privacy protection that Congress ordained. Whatever the normal power of a reviewing court to "fill in the gaps" in a statute that falls short of covering the area generally delineated by Congress, that power is clearly trammeled in FOIA.

Congress made it very clear that the Act was intended to make all Government records subject to public disclosure, with only nine "exclusive" and "narrowly construed" exceptions. *Department of the Air Force v. Rose,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). That the privacy concerns expressed in the "second step" of Exemption 6 cannot be reached in this case is the function of the clear threshold that Congress created in the "first step" of Exemption 6. Any needed repairs to the way in which privacy concerns are protected by Exemption 6 must be undertaken by Congress, not by the courts.